FOX v. HOUSTON & T. C. RY. CO. et al.*
(No. 7428.)

(Court of Civil Appeals of Texas. Dallas. April 15, 1916. Rehearing Denied June 10, 1916.)

1. CARRIERS ⟨⟩318(10)—INJURIES TO PASSENGERS—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held* sufficient to support a verdict for defendant in an action by a passenger to recover for injuries alleged to have resulted from a sudden jerk of the train after stopping at a station.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1313; Dec. Dig. ⟨⟩318(10).]

2. EVIDENCE ⟨⟩127(2)—RES GESTÆ.

A statement, "I am nearly killed," made by a passenger injured on a train at the time of the injury and in answer to an inquiry, is admissible in action for damages as part of the res gestæ.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 379; Dec. Dig. ⟨⟩127(2).]

3. APPEAL AND ERROR ⊛═1056(1)—HARMLESS ERROR—EVIDENCE—RES GESTÆ.

.In an action for personal injuries, error in excluding testimony admissible as part of the res gestæ held not prejudicial in view of all the testimony.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187, 4191, 4207; Dec. Dig. ⊛═1056(1).]

4. TRIAL ⊛═295(9) — INSTRUCTIONS—CONSIDERED AS A WHOLE.

Instructions must be read as a whole, and, if when so considered they correctly present the law, error cannot be predicated on a portion alone, which might be said to be on the weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 711; Dec. Dig. ⊛═295(9).]

5. APPEAL AND ERROR ⊛═692(1)—EVIDENCE—ADMISSIBILITY—REVIEW.

The action of the court in excluding answers to questions except on cross-examination will not be reviewed, in the absence of the bill of exceptions showing what the answers would have been.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2905, 2906; Dec. Dig. ⊛═692(1).]

6. APPEAL AND ERROR ⊛═1056(1)—HARMLESS ERROR—EVIDENCE.

In a personal injury action, the refusal of the court to permit plaintiff's witness, a physician, on redirect examination, to testify as to defendant's custom of paying its physicians annual salaries for services including testimony in court, held not reversible error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187, 4191, 4207; Dec. Dig. ⊛═1056(1).]

7. EVIDENCE ⊛═317(3)—COMPETENCY—HEARSAY.

.Where defendant introduced evidence that plaintiff made no complaint of the injury received, the rule that statements made by plaintiff to others at or near the same time are admissible in rebuttal does not permit the introduction of hearsay statements made by others in reference to plaintiff's injury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1176; Dec. Dig. ⊛═317(3).]

8. DEPOSITIONS ⊛═95—ADMISSION OF PART IN EVIDENCE—COMPETENCY OF REMAINDER.

That an answer to an interrogatory is responsive does not render admissible that portion of the answer which is hearsay.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 276, 277; Dec. Dig. ⊛═95.]

9. TRIAL ⊛═43 — EVIDENCE — ADMISSION OF ARGUMENT OF COUNSEL.

The admission of testimony pursuant to an offer made in answer to argument of opposing counsel is a matter of discretion with the court.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 123; Dec. Dig. ⊛═43.]

10. NEW TRIAL ⊛═142—MISCONDUCT OF JURY—EVIDENCE.

Under a statute authorizing the trial court to consider misconduct of the jury as ground for a new trial and requiring proof thereof to be made in open court, ex parte affidavits of jurors cannot be considered.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. § 297; Dec. Dig. ⊛═142.]

11. APPEAL AND ERROR ⊛═977(1)—MISCONDUCT OF JURY—DISCRETION OF COURT.

Under a statute giving a trial court discretion to set aside a verdict and allow a new trial for misconduct of jury, the action of the court will not be reviewed unless there has been an abuse of discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3860; Dec. Dig. ⊛═977(1).]

12. NEW TRIAL ⊛═140(3) — MISCONDUCT OF JURY—SUFFICIENCY OF EVIDENCE.

Evidence held sufficient to sustain the order of the trial court refusing a new trial on the ground of misconduct of the jury.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 287, 302; Dec. Dig. ⊛═140(3).]

Appeal from District Court, Hunt County; A. P. Dohoney, Judge.

Action by R. L. Fox against the Houston & Texas Central Railway Company and another. From a judgment for defendants and an order denying a new trial, plaintiff appeals. Affirmed.

H. L. Carpenter and B. Q. Evans, both of Greenville, for appellant. Dinsmore, McMahan & Dinsmore, of Greenville, Baker, Botts, Parker & Garwood, of Houston, and Terry, Cavin & Mills, of Galveston, for appellees.

TALBOT, J. This case has been before the appellate courts of the state before. See 156 S. W. 922, and 166 S. W. 693. The suit was brought by the appellant, Fox, against the Gulf, Colorado & Santa Fé Railway Company and the Houston & Texas Central Railway Company to recover damages for personal injuries alleged to have been sustained by his wife, Mrs. Mary Fox, while she was a passenger en route from Celeste, Tex., to Bertram, Tex. The defenses were general denials and pleas of contributory negligence on the part of the appellant's wife. At the conclusion of the evidence the court instructed the jury to return a verdict in favor of the Gulf, Colorado & Santa Fé Railway Company, and submitted the case as to the Houston & Texas Central Railway Company to the jury on a general charge. The jury returned a verdict in favor of both defendants, and, judgment being rendered accordingly, the plaintiff, Fox, appealed.

There is no controversy over the pleadings, and it is not assigned that the court erred in directing a verdict for the Gulf, Colorado & Santa Fé Railway Company. It appears that on or about the 22d day of December, 1910, Mrs. Fox, appellant's wife, bought a through ticket at Celeste, Tex., entitling her to passage from Celeste over the road of the Gulf, Colorado & Santa Fé Railway Company to Dallas, and thence over the road of the Houston & Texas Central Railway Company to Hearne, Tex., where Mrs. Fox changed cars to continue her journey to Bertram. Mrs. Fox was accompanied by her little son about 10 or 11 years of age, for whom also a ticket had been purchased entitling him to passage from and to the points mentioned. Mrs. Fox testified, in substance, that as the train of the Houston & Texas Central Railway Company upon which she was traveling

approached Hearne, about 2 o'clock in the night, the station was announced and the train stopped; that, while the train was standing still, she arose from her seat and started to disembark; that, after taking a step or two towards the car door, the train was moved with a sudden jerk forward and then backward almost at the same instant of time, which threw her off her balance and to the floor of the car. She said:

"I was just thrown down in a creen, and I felt a pain strike me in the small of my back, and it was very hard, and it hurt me and seemed like it hurt me all over. It seemed like just a little bit of time that I didn't realize what was going on, I was hurt so bad, and my little boy came to me. He had hold of me the first thing I knew. Right then I felt kind of a numbness, and I was jerking it seemed like, at that time, all over very bad."

She further testified that her little boy helped her up, and that they ,went out of the car into the station house at Hearne, where she stayed until about 11 o'clock forenoon of that same day, when she took another train and continued her journey to Bertram, still suffering from her injury. Mrs. Fox further testified that when she started to Bertram she weighed about 157 or 158 pounds and did not have anything the matter with her back and had never suffered with any injury to her back; that a day or two prior to the day she testified she weighed 107 pounds. She further testified that the first few months after she was injured she was strong enough to get about and do some work about the place, but finally got so she could do practically nothing. All of which was attributed to the nature and extent of her injury.

[1] The first assignment of error asserts that:

"The verdict of the jury is contrary to and not supported by the evidence, but is against the evidence, in that the evidence of Mrs. Fox and her son, who testified that the train, after it ran up to the station of Hearne and stopped, gave a sudden, unusual, and unnecessary double jerk, was undisputed, and, when taken in connection with evidence offered by the defendant, makes it a clear case of undisputed evidence of negligence and injury, and the evidence is undisputed that plaintiff's wife, when sne fell, received and sustained an injury that caused her to suffer great physical pain and mental anguish, and the evidence as to her injuries was undisputed, and the jury was not authorized to discredit or disregard the undisputed evidence of the plaintiff's wife and the plaintiff's son, who testified to the facts that caused her to fall in said train."

The appellee objects to the consideration of this and other assignments because not briefed in accordance ,with the rules. The grounds of objection are various, and, while we think some of them are well taken, yet upon the whole we conclude we would not be justified in declining to consider and pass upon the questions sought to be presented. The substance of the assignment now under consideration is, as will be observed, that the undisputed evidence of Mrs. Fox and her son shows that the operatives of the train upon

which Mrs. Fox was traveling negligently moved it with an unnecessary and unusual "double jerk," which caused Mrs. Fox to be thrown to the floor of the car and injured, and that the jury was not authorized to disregard her undisputed evidence, and the evidence of her son, who testified to such movement of the train. We do not concur in the view of the evidence as expressed in the assignment. On the contrary, we think the evidence clearly raised issues of fact as to whether the train was moved with a jerk at the time appellant's wife was leaving the car at Hearne, and whether the same caused her to be thrown to the floor and injured as claimed. It does not appear from the record sent to this court that Mrs. Fox's son, who was accompanying her, testified at all, and there is substantial testimony offered by appellee rebutting the testimony of Mrs. Fox and supporting the verdict of the jury.

W. S. Buchanan testified that he was conductor on the train; that he kept a train book, ,which he had before him when testifying, in which he kept a record; that he assisted passengers off the coach and chair car; that the water tank was from 250 to 300 yards from the station; that on the occasion in question he did not remember any unusual movements of the train; that if the train had moved in such a way as to jerk any one on the train he would have a record of it and a report of it; that he had no record of any such happening, and he did not hear or learn anything about anybody falling on the train.

Hugh Cleveland testified that he was auditor on the train at the time appellant's wife claims to have been hurt; that when the train stopped at Hearne he would take his position on the platform at the front of the chair car where he could see into the car, and know when the passengers were out; that he did not see any lady or anybody stumble and fall; that if there had been a jerk of the train backward or forward he thinks he would have noticed it; that no such thing happened there as he recollects; that if he had observed anybody fall it was his duty to get their names and report it. On cross-examination this witness said:

"If there had been a double movement of the train that night sufficient to knock a woman down, I would have noticed that, because that is unusual."

George Stubblefield, porter, testified:

"On the night of December 22d, or the morning of the 23d, when we were at Hearne, I don't know anything at all about any accident happening there that night. I don't know anything about any jerking or unusual movement of the train there. I didn't hear anything about anybody falling down or getting hurt in the train that night until a long time afterwards, when I was notified."

Mrs. Fox, wife of appellant, testified that after leaving the train at Hearne about 2 o'clock in the morning she went into the station, and remained in the station until about 11 o'clock in the forenoon; that her son,

Otie, went out and bought their breakfast, and brought it into the station, and they ate it there; that about 11 o'clock she took the train and went to McNeal, where she stayed all night with a family named Fizer. Mrs. Willie Fizer testified that Mrs. Fox came to her home at McNeal in the late afternoon and spent the night with her; that Mrs. Fox seemed to be in perfect health; that she was very talkative and wanted to help her do things around the house; that Mrs. Fox talked to her about the trip and spoke of the long time she had to remain at Hearne, but she did not say anything about being injured. Mrs. Fox in holding family prayer at witness' house stated that she had been fortunate in not having any accident of any sort thus far, and that she hoped that she would not on the rest of her journey. W. S. Fizer testified that Mrs. Fox spent the night at his home; that she acted like she was in good health; that that night in holding family prayer Mrs. Fox said she was thankful she had reached this far on her journey without having an accident, and that she hoped she would reach her sister's in the same way; that she said nothing about any accident. Mrs. Fox testified that she got to Bertram about 11 o'clock on the same day she left McNeal, and this was Saturday; that her sister lived about a half or three-quarters of a mile from Bertram; that on the night of the next day, Sunday, she walked from her sister's home to church, about as far as from her sister's to Bertram, and walked back; that during the three or four days she was at her sister's near Bertram she visited her nieces, Mrs. Dorbandt and Mrs. Ball, traveling in a wagon. S. S. Dorbandt testified that his wife was a niece of Mrs. Fox; that he saw Mrs. Fox at Bertram the last of December, 1910; that he did not observe any action of Mrs. Fox that suggested any injury physically. Mrs. Cora Dorbandt testified that she was a niece of Mrs. Mary Fox, and that she was the daughter of Mrs. Cox, sister of Mrs. Fox; that she saw Mrs. Fox when she was visiting at Bertram in December, 1910; that Mrs. Fox was at her home once and took supper with her, and she talked with her; that she did not hear Mrs. Fox complain of having received any injury; that she did not notice in the conduct of Mrs. Fox anything which indicated or suggested any physical injury or disability; that she never heard of Mrs. Fox having received any injury on her journey from Hunt county to Burnett county until after Mrs. Fox had returned home.

Mrs. Fox claimed to have been injured on the early morning of December 23, 1910. On April 12, 1911, Mrs. Fox made application to the Lone Star Insurance Union for life insurance, in which application she stated that she had no physical defect. Dr. P. S. Pearson testified that he, on April 12, 1911, examined Mrs. Mary Fox for life insurance,

and Mrs. Fox at that time appeared to be in perfect health; she was robust and strong looking, and he judged her to be in good health; that on that occasion appellant and his wife asked witness if he thought they would pass the examination, and witness told them that he did not see any reason why they could not, that they were first-class risks as far as he could see. A life insurance policy was issued to her on her application above mentioned, and on an examination by Dr. Pearson. Mrs. Fox testified that the first time a doctor called to see her after she got back home from Bertram was on May 4, 1911, when Dr. Williams was called, and Dr. Williams testified that the first time he was called to see Mrs. Fox was on May 14, 1911. Plaintiff's original petition in this case was filed in the district court of Hunt county on May 2, 1911. Dr. M. L. Wilbanks testified that he made a careful examination of Mrs. Fox to ascertain her physical condition at the time of a former trial of this case; that he found no objective symptoms of injury, and nothing indicating abnormality, except the loss of weight represented to him; that there was no curvature of the spine. Dr. D. L. Gaillard testified that he examined Mrs. Fox at the time of the first trial and made a thorough and careful examination; that he found no objective symptoms of injury or disease, though she complained of pain and soreness; that there was no curvature of the spine. In rebuttal of the foregoing, the appellant offered testimony to the effect that on other occasions and to different persons his wife, Mrs. Fox, did speak of having been hurt in an accident while on the trip to Bertram; but we shall not undertake to give all the testimony bearing upon the issues. We deem it necessary to state only so much of it as may show the correctness of our conclusion that whether Mrs. Fox was injured at the time, and in the manner alleged by appellant, were controverted issues of fact, and that it was the province of the jury to settle them. The evidence now before this court touching the issues is, in a large measure, the same as it was on the former appeal of the case, and the Supreme Court then said:

"The facts of the accident were proved by Mrs. Fox only, and no other person on the train is shown to have known of the severe lurching of the train. The jury would have been justified in finding against her evidence."

[2, 3] The appellant offered to prove by Mrs. Fox that at the very time she claims to have been injured her little boy asked her if she was hurt, and that she replied, "I am nearly killed." This testimony was objected to because hearsay and self-serving. The objections were sustained, and the appellant complains of the court's ruling. This statement of Mrs. Fox was clearly admissible as a part of the res gestæ and it was competent to make proof of the same by her. Railway Co. v. Hall, 34 Tex. Civ. App. 535, 80 S. W. 133. But we are of the opinion that it

cannot be fairly said that its exclusion resulted in any material injury to appellant. In other words, we think, in view of all the testimony in the case, that the error of the court amounted to no such denial of the rights of the appellant as was reasonably calculated to cause the rendition of an improper judgment in the case. Rule 62a (149 S. W. x). Full latitude was allowed Mrs. Fox in detailing the manner in which she claimed to have been hurt and the extent of her injuries, and it is not believed that this court would be warranted in saying that it is probable a different verdict would have been rendered by the jury had such declaration been admitted.

[4] The next contention is that the court erred in the fifth paragraph of the general charge in instructing the jury as follows:

"You are charged that the fact of an injury to a passenger alone will not authorize a recovery against a railway company."

The objection to the charge is that it was upon the weight of the evidence. That portion of the court's charge complained of is only a part of a paragraph of the charge, and the effect of the whole paragraph, when fairly construed, was to instruct the jury that appellant was not entitled to recover except upon proof of injury to his wife through the negligence of the appellee, and when considered as a whole, which must be done, was not, if in any event it would have been, a charge upon the weight of the evidence.

[5] The fourth assignment of error complains of the court's action in sustaining objections of the appellee to a hypothetical question propounded to Dr. Williams. In overruling this assignment, it is sufficient to say that the bill of exceptions reserved to the court's ruling does not show what the answer of the witness would have been, if the question had been allowed. Without being informed of what the answer of the witness would have been, we cannot tell that the appellant has suffered any injury by its exclusion. Except perhaps on cross-examination of the opposing parties' witness, the rule is so well established that, in the absence of a bill of exceptions showing what the answer would have been had the witness been permitted to testify, the action of the court will not be reviewed on appeal, it is unnecessary to cite authorities in support of the proposition.

[6] It is further assigned that the court erred in refusing to permit the witness Dr. J. A. Smith, on redirect examination, to answer the following question propounded by appellant:

"He (appellee's counsel) asked you awhile ago about how you was paid for your services. I will ask you if you do not know it is a fact that the railroads pay their physicians by the year a regular salary?"

The question was objected to on the grounds that it was immaterial and not in rebuttal. The objections were sustained, and the appellant excepted. The bill of exceptions recites that:

Appellant "could and would have proved by the witness, if he had been permitted to answer, that the railway surgeons for the defendant, who had testified for the defendant in this case, were paid a regular salary by the year for all their services, including their services in attending court and testifying when called as witnesses for the defendant in personal injury cases."

Appellant suggests that the witness Dr. Smith was asked by appellee's counsel how he was paid for his services as a witness in personal injury cases for the purpose of discrediting him, but it is not made to appear either in the brief or by the bill of exceptions what answer the witness gave to the question, or that such answer tended in the slightest to discredit him. For aught we know from the record, the answer elicited to the question propounded by appellee's counsel may have utterly failed to disclose anything that tended to impeach or discredit the witness and hence harmless. If the testimony sought to be elicited by the question of appellee's counsel failed of its purpose, no rebutting testimony was needed, and the question asked by appellant's counsel and not allowed was entirely immaterial. But we are inclined to think that in no event was the ruling of the court reversible error.

[7, 8] The appellees propounded to the witness J. K. P. Cox the following interrogatory:

"Is it not a fact that while Mrs. Mary Fox was visiting at your home in Burnett county in December, 1910, you did not hear from any source anything about Mrs. Mary Fox having received any injury on the cars and on her way from her home to your home?"

And introduced in evidence the following portion of the answer of said witness to said interrogatory, namely:

"I didn't hear Mrs. Mary Fox while at my home in December, 1910, say anything about receiving any injuries while on the cars from her home to my home."

The appellant then offered in evidence the remaining portion of said answer, which is as follows:

"I heard some of my children speak of her getting hurt on the way to my home."

The appellant contends that:

Appellee "having propounded the interrogatory and having availed itself of that portion of the answer that was favorable to it, and the balance of the answer being responsive to the question and being in direct rebuttal of the defendant's theory that plaintiff and his wife had fabricated the story of Mrs. Fox's injury and that they had never mentioned the fact until about the 1st of May, 1911, it was prejudicial error for the court to exclude the balance of the answer offered by plaintiff."

We think there was no error in excluding the testimony. It was clearly hearsay, and of a very indefinite character at that. It will be noted that the portion of the answer offered by appellant and excluded by the court was simply to the effect that the witness had heard some of his children speak of Mrs. Fox getting hurt on the way to his home. From whom the children of the witness learned that Mrs. Fox had been hurt on

her way to the witness' home, or how she got hurt, or when and where she got hurt, or when it was that his children heard that she had received the injury referred to by them, does not appear from the answer excluded, or any other portion of said witness' evidence. Appellee having introduced the testimony of certain witnesses to the effect that appellant's wife made no complaint of the injuries for which recovery was sought, for the purpose of showing that her claim was a recent fabrication, it was admissible for the appellant to introduce statements by his wife to others at or near the same time, which tended to prove the occurrence of the accident and injury; but the rule does not authorize the introduction of the statement of a witness that he had heard a person other than the party claimed to have been injured "speak" of such injured person having been hurt. That portion of the answer offered by appellant was therefore inadmissible, and the fact that appellee declined to read it in evidence, although perhaps responsive to the question propounded, did not, as said by appellee's counsel, make the answer any less hearsay or admissible when offered by appellant.

[9] It appears that while B. M. McMahan, Esq., was addressing the jury in behalf of the appellee, he said, in effect, that it was strange plaintiff had never produced a single person who was not related to his wife, or the family, who had ever heard of her being injured on the train at Hearne until after or about the 1st day of May, 1911, and that appellant's counsel interrupted Mr. McMahan and offered to introduce then in evidence the testimony of two witnesses to the effect that, about three or four weeks after Mrs. Fox returned from her trip to Bertram, they first learned that she and her husband, R. L. Fox, were claiming that she was injured on a railway train during the time of her visit to Bertram. For similar reasons to those given in holding that the testimony of the witness Cox, discussed above, was inadmissible, the testimony here under consideration was inadmissible. Appellant did not offer to show that the witnesses, whose testimony was excluded, "learned" that Mrs. Fox had been hurt in an accident on appellee's train from Mrs. Fox herself. The testimony was hearsay and self-serving, and the statement of counsel in argument, to which reference has been made, even if improper—a question we need not decide—did not authorize its admission. At least, its admission at such time was a matter of discretion with the court.

The refusal of similar testimony offered during the trial and before argument was begun is made the basis of appellant's eighth assignment of error, and, for the reason just stated, said testimony was inadmissible and properly excluded.

[10] The ninth and tenth assignments of error assert that the court erred in not granting the appellant a new trial on account of the misconduct of the jurors Dan Dansby and J. H. Briggance. There was evidence to the effect that appellant's wife had become very much reduced in flesh since the date of her alleged injury, and that she had been using acetanilide tablets. The ninth assignment charges, in substance, that while the jury was deliberating upon a verdict and discussing the issue as to whether appellant's wife, Mrs. Fox, had been injured at all by the jerk of appellee's train, the juror Dansby went outside of the record and stated that the acetanilide tablets which the evidence showed Mrs. Fox had been taking was a coal tar preparation, and that from his knowledge as a pharmacist the use of such tablets was calculated to reduce flesh; that the appellee had introduced the testimony of experts as to the effect of drugs on the condition of the flesh of a person taking them; but that such testimony had reference only to opiates included in morphine and other derivatives of opium or bromides and chlorals, and not to such a drug as acetanilide tablets. The tenth assignment is, in substance, that the juror Briggance said to one or more of the members of the jury while they were considering the case that Dr. Hyder, who had testified as a witness, sat in the courtroom a part of the time the case was being tried for the purpose of listening to other witnesses that he might testify for the plaintiff; that Dr. Hyder did not come over from Commerce for the purpose of testifying in the case, but that he came over as a witness before the grand jury, and that Mr. Evans, seeing him, sent him out for Dr. Smith to post him as to what to swear; that he (Briggance) knew Dr. Hyder personally and well; and that he was wholly unworthy of belief. The appellee filed a written reply to and contest of the appellant's motion for a new trial based on the alleged misconduct of the jurors named, and upon the issue thus formed testimony was heard and decided by the court in favor of the appellees. In the statement made by appellant in support of his ninth assignment, he quotes ex parte affidavits purporting to have been made by jurors Dan Dansby, C. R. Boyd, and J. W. Poston, which appear to have been attached to and made a part of appellant's motion for a new trial. The affidavit of the juror Boyd is also quoted in the statement made in support of the tenth assignment of error.

[11] The statute, authorizing the trial court to consider the misconduct of the jury as a ground for setting aside their verdict and granting a new trial, requires proof of such misconduct to be made in open court, and the affidavits of the jurors mentioned cannot be looked to and considered in passing upon this assignment. In addition, however, to the affidavits referred to, much of the oral testimony of the juror Boyd, taken on the hearing of the motion for new trial,

is quoted in the statements in support of the assignments. This testimony of Boyd is to the effect that he understood the theory of the appellee was that Mrs. Fox had not been injured by being thrown to the floor of the railroad car, but that her condition was due to the drugs she had taken; that on the first vote taken the jury stood eight to four in favor of the appellee; that some of the jurors were of the opinion she did not receive the fall claimed by her on the train; that while talking about the case the juror Dansby said he did not believe Mrs. Fox was hurt; that he believed her condition was caused from the acetanilide tablets she had been taking; that he (Dansby) was a pharmacist and knew what acetanilide tablets contained; that he knew it was a coal tar product and that a person could take so much into the system that it would undermine the digestive organs and cause such person to lose flesh; that such argument was made by Dansby before a verdict had been agreed on and while the case was being discussed; that he heard the doctors testify that medicines that were derivatives of opiates or morphine would make people lose flesh; that if Dansby had not said a word about coal tar products he would not have agreed to the verdict. In answer to the direct question, that if he would not have agreed to the verdict if Dansby had not said anything about the coal tar preparation, he said: "Well, I don't know; I might have agreed, and I might not." Boyd further testified that he talked with the juror Briggance about the doctors who had testified in the case; that Briggance said he did not believe Dr. Hyder's statement; that Dr. Hyder was there attending the grand jury, and he had just been picked up and gone on the stand and testified after talking with Dr. Smith and without being posted; that he (Boyd) asked Briggance why he did not think Dr. Hyder was telling the truth, and he replied:

"Well, I am in the drug store with him, and he is a big wind-jammer, and he will do anything or say anything."

. It appears that only four of the jurors were at any time disposed to find that appellee was liable, and the juror J. W. Poston testified that he was the last of the four to agree to a verdict for the appellee; that he did not hear the juror Dansby say anything about coal tar preparations until after he had agreed to the verdict rendered. He said:

"It was after the last juror had agreed on the verdict before I heard Dan Dansby say anything about this coal tar product and just before we came out of the jury room."

The juror Briggance, one of the four jurors who at first voted in favor of liability of the appellee, testified:

"I heard Mr. Dansby say something about acetanilide tablets, but just what he said I cannot recollect, because I did not notice just what he did say. * * * Mr. Reed was the first man to come over. Mr. Pearson read him the court's charge, and that seemed to change him. I don't remember the time I brought Dr. Hyder's name up. I said I didn't believe I would take Dr. Hyder's statement, but I didn't say he was a big wind-jammer."

W. F. McCormick, another juror who voted for liability, testified:

"I heard Dan Dansby and Poston and two or three others talking about that coal tar product, but I never paid any attention whatever to what they said, and what Dansby said had no influence on me."

D. C. Shrader, another juror, testified:

"I remember Dansby saying something about the coal tar preparation, but I do not remember what it was, or whether it was before or after we reached the verdict."

F. H. Pearson, one of the jurors, testified that he did not hear Dansby say anything about acetanilide tablets. J. B. Reed, another juror, testified:

"I was one of the four in favor of the plaintiff when a vote was first taken. I never heard Dansby make any statement about coal tar tablets or acetanilide tablets."

The testimony of the jurors is not entirely in accord as to when the statements relied on as misconduct were made. The condition of the testimony is perhaps such as would warrant a finding that they were made before the verdict was agreed on, or a finding that they were made after it was agreed on. Neither of the jurors, as we understand their testimony, was influenced by the unauthorized statements, except the juror Boyd. He testified at first that without such statements he would not have agreed to the verdict, but afterwards stated, in effect, that he did not know whether he would or would not have agreed to the verdict rendered if such statements had not been made. There is also some conflict as to the statement made by the juror Briggance in reference to the witness Dr. Hyder. The extent of his statement in regard to this witness, according to his testimony, is that he did not remember the time during the deliberations of the jury that he brought Dr. Hyder's name up; that he said he did not believe he would take Dr. Hyder's statement; but that he did not say he was a big wind-jammer. It does not appear by his testimony that he stated that Dr. Hyder "would do anything or say anything." But, however these things may be, the statute leaves it to the discretion of the trial court to set aside a verdict for misconduct of the jury, and the appellate courts will not interfere with exercise of such discretion, unless it clearly appears that the same has been abused. It has been repeatedly so held by the Supreme Court and Courts of Civil Appeals of this state. Kalteyer v. Mitchell, 102 Tex. 393, 117 S. W. 792, 132 Am. St. Rep. 889; Id., 110 S. W. 462; Railway Co. v. Blalack, 128 S. W. 706; Railway Co. v. Brown, 140 S. W. 1172; Railway Co. v. Blue, 46 Tex. Civ. App. 239, 102 S. W.

128; Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606. In Kalteyer v. Mitchell, 110 S. W. 462, the court said:

"The statute * * * which permits the dangerous practice of impeaching and destroying a verdict of a jury by testimony of members of the jury has a saving clause, which places the granting of a new trial on the ground of misconduct of the jury in the discretion of the trial court, and this court will never interfere with the exercise of such discretion unless there appears a gross abuse of the same."

The trial court heard all the evidence introduced at the trial of the case and on the motion for a new trial. He not only heard the witnesses testify, but saw them and "could form safer conclusions thereby than this court can from the record."

[12] The contention of the appellant that the expert testimony showing the effect of certain drugs on the condition of a person's flesh, and its tendency to reduce flesh, "did not touch the effect of such drugs as acetanilide," is not in our opinion borne out by the record. Dr. Cantrell testified that the habitual use of such drugs as opiates, drugs that upset the digestion and dull and benumb the nervous system until it will act for days or weeks without performing its functions properly, are the most active and the quickest in producing disease, and that "opiates" in the proper meaning of the word includes narcotics of all kinds; that the use of such drugs will upset the digestion and dull the nervous system just as sure as it is persisted in, and will cause neurasthenia. Dr. Wilbanks said that the frequent use of such drugs affected the digestion and reduces flesh. To the same effect is the testimony of all the doctors who testified on the subject. The juror Dan Dansby, on the hearing of the motion for a new trial, testified that he told the jury that acetanilide tablets were a coal tar product; that it was a product of opiates, but a derivative of coal tar; that the continued use of it would have a bad effect on the system; that it might have a tendency to break down the system. Thus it appears, we think, that the statement of Dansby to the jury while in the jury room concerning the nature and effect of acetanilide is not materially different from the testimony offered on the trial of the case upon that subject, but is in harmony therewith, and that this court would not be warranted in saying that the trial court was not justified in concluding that such statement of the juror Dansby did not result in any injury to appellant. At all events, there does not appear to be such a clear abuse of the discretion of the district court in refusing a new trial on the ground of the misconduct of the jury as would warrant this court in holding that such refusal was reversible error.

The evidence supports the verdict, and the judgment of the court below will be affirmed.

Affirmed.