### MOORE v. IVEY et al.  (No. 8521.) *

(Court of Civil Appeals of Texas. Galveston. May 9, 1924. Rehearing Denied June 5, 1924.)

1. **Physicians and surgeons ⟲18(8)—Finding sponge left in incision warranted by evidence.**

Finding that sponge going through intestines was left in incision by defendant *held* sustained by evidence, and not against weight of evidence.

2. **Physicians and surgeons ⟲15 — Leaving sponge in incision negligence.**

A surgeon leaving a sponge in incision is necessarily negligent.

3. **Appeal and error ⟲1170(6)—Judgment held not to be reversed for misconduct of jury.**

Talk of jurors as to amount of recovery in other cases, and as to attorneys' fees, and that defendant doctor was threatened with suit by another, and probably had insurance, *held* not such misconduct as to call for a reversal, in view of Rev. St. art. 2021.

4. **Appeal and error ⟲978(3)—New trial ⟲44(1)—Discretionary with trial court to set aside verdict for misconduct of jury.**

Rev. St. art. 2021, leaves it to discretion of trial judge to set aside verdict or misconduct of jury, and appellate courts are authorized to disturb verdict where new trial refused only where it is shown that trial court has abused discretion.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by Ruby Carter Ivey, joined pro forma by her husband, B. J. Ivey, against John T. Moore. Judgment for plaintiffs, and defendant appeals. Affirmed.

Andrews, Streetman, Logue & Mobley, of Houston, for appellant.

Woods, King & John, of Houston, for appellees.

---

⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted November 12, 1924.

LANE, J. This suit was brought by Ruby Carter Ivey, joined pro forma by her husband, B. J. Ivey, against Dr. John T. Moore, to recover damages in the sum of $25,750.

The plaintiffs alleged:

That Dr. Moore had been by them employed to perform an operation upon the body of plaintiff, Mrs. Ruby Carter Ivey; "that as a part of said operation the defendant used certain gauzes and sponges, and after the defendant had made the incision and opened said plaintiff's body, and as a part of said operation, which defendant had agreed to skillfully perform, there were placed in plaintiff's body certain pieces of gauze and sponge, commonly used by surgeons in performing such operations, and that the defendant was guilty of inexcusable negligence in the performance of said operation in failing to remove a piece of gauze or sponge so placed in said plaintiff's body, as the result of which said plaintiff has suffered great pain of both body and mind, and a serious and permanent impairment of her health, as more particularly hereinafter described; that the defendant was guilty of negligence in the performance of said operation, which was the proximate cause of plaintiff's injury, suffering, and impairment of health, and without which acts of negligence plaintiff would not have suffered, in the following particulars, to wit:

"(a) In leaving a piece of gauze or sponge, approximately 6 inches wide and 18 inches in length, in said plaintiff's body when the wound was closed.

"(b) In not using said gauze or sponge in a careful, prudent, and skillful manner.

"(c) In not removing said gauze or sponge from the body of plaintiff before closing said wound.

"(d) In closing up the wound in plaintiff's body without removing said gauze or sponge from the body."

The defendant answered by general demurrer and general denial.

The cause was tried before a jury, who, in answer to special issues propounded to them, found:

(1) The defendant, in the operation done on Mrs. Ivey, did use and fail to remove a sponge or bit of gauze before closing the incision.

(2) The failure of the defendant to remove the sponge or bit of gauze used in said operation was negligence on his part.

(3) As a proximate result of such negligence plaintiff suffered injuries complained of.

(4) Her damages resulting from such negligence amount to $8,750.

Upon the verdict of the jury judgment was rendered in favor of Mrs. Ruby Carter Ivey against Dr. John T. Moore for the sum of $8,750. From such judgment Dr. Moore has appealed.

Appellant submits as reasons for a reversal of the judgment substantially the following:

First. That the finding of the jury that appellant, Dr. Moore, in the operation done by him on Mrs. Ivey, did use and fail to remove a sponge or bit of gauze before closing the incision is so against the weight and preponderance of the evidence as to be clearly wrong, and should be by this court set aside.

Second. That, if it be conceded that Dr. Moore left the sponge in the body of Mrs. Ivey, as found by the jury, such fact alone is not sufficient to support a further finding that Dr. Moore was negligent in performing the operation, and that, as there was no other evidence tending to show negligence on the part of Dr. Moore, the finding of the jury upon that issue should be set aside.

Third. That the finding of the jury that Dr. Moore left the sponge in the body of Mrs. Ivey was probably brought about by the misconduct of the jury in discussing matters not in evidence.

Fourth. That the judgment was excessive in amount, and that such excess was brought about by the misconduct of the jury in discussing matters not in evidence.

These complaints may, we think, be reduced to but three, to wit: First, that the finding of the jury that Dr. Moore left the sponge or gauze in the body of Mrs. Ivey is so against the weight and preponderance of the evidence as to be clearly wrong, and therefore the same should be set aside and the judgment based thereon reversed; second, that the jury was guilty of misconduct, and that such misconduct probably brought about the finding that Dr. Moore left the sponge or gauze in the body of Mrs. Ivey; and, third, that such misconduct of the jury probably brought about an excessive award.

We shall consider these complaints in the order named.

It was shown that Mrs. Ivey gave birth to her first child in 1914, and that during the two years intervening between the birth of her first child and the birth of her second child in 1916 her health got worse, and that she remained in ill health from that time up to June, 1920, at which time Dr. A. A. Nelson, of Nacogdoches, performed an operation upon her. This operation became necessary because of lacerations following the birth of her child, which caused a displacement or what is commonly known as falling of the womb. In this operation her abdomen was opened and the womb was suspended, and at the same time her appendix was removed and a small cyst on one of her ovaries was punctured. In the performance of this operation Dr. Nelson was assisted by Dr. Barham and nurses at the Nacogdoches Hospital, where the operation was performed.

Mrs. Ivey testified that after the operation performed by Dr. Nelson in June, 1920, she remained in bed about twelve days, and in about two weeks thereafter she was able to be up, and around the house; that after she left the hospital and went home she began to gain strength and felt fine, better than

she had for a long time, and that within 3 months' time she was feeling better than normal; that she felt unusually well, and that in the third month after said operation by Dr. Nelson she released her servant and began to do her own housework, and continued to do so; that she did all of her cooking, housecleaning, and sewing, and also attended to her children; that she continued to do such work up to April, 1921; that in April, 1921, she had an attack of acute bladder trouble, and suffered intense pain in the bladder, which continued until she went to Houston in November, 1921, and was operated on by Dr. Moore; and this trouble was the cause of her going to Houston to see Dr. Moore: that she came to Houston to have a kidney operation performed by Dr. Moore; that Dr. Moore performed the kidney stone operation, and removed the stone; that after such operation she returned to her home in Nacogdoches in December, 1921; that she was confined to her bed most of the time through December, but improved some in January, 1922, and gained a little strength, and felt fairly well except for soreness and bloat in her left side; that her left side felt like it was swollen, and that through the month of February, 1922, she suffered a great deal of pain in her left side—felt like something rubbing together in her side; that after the Moore operation she stayed in her house for the first three months because of her weak condition and the soreness in her left side, and in about three months after the Moore operation she had a hard chill, which was followed by fever; that she had three chills in one day at first, along about the 1st of March, 1922; that she continued to have these chills and fevers for a week, and then in about ten days she had another spell of chills, and these spells came on periodically, about ten days intervening between them; that during these spells she suffered intense pain in her side and bladder; that she called in Dr. Nelson, and he gave her prescriptions for the purpose of relieving her troubles, and about April she began to get over the chills—that is, they were lighter, and she felt some better—but in May she had another spell of chills, and they were accompanied by a painful urination, pain in her bladder, and keen pains in her intestines for about a week, and along about the last part of May she had a slight spell of diarrhea, and the pains became so severe as to make her sick; that on the 13th day of June, 1922, a piece of gauze passed through her intestines; that as this gauze was about to pass she caught hold of it, and tore a piece off the end of it; that she realized that she could not pull the gauze from her intestines, as it would rebound, and pain would come in her side around her kidneys when she pulled it; that she finally got Dr. Barham, of Nacogdoches, who came and re-

moved the gauze through the rectum with a pair of tweezers; that when the gauze was removed she felt pain and a pull in her side; that she could feel the gauze uncoil coming down her intestines, and it pained her, and felt as though it had adhered to the intestines or 'side; that it felt like it had pulled loose from something around or about her kidney; that the gauze removed was about 18 inches long after it was sterilized and straightened out. The witness here identified a piece of gauze shown her as being that taken from her, which was about 8 inches wide and 32 to 34 inches in length. Dr. Barham removed the gauze on the 13th day of June, 1922.

She further testified that from the time she was operated on by Dr. Moore in November, 1921, she had not been able to be up and attend to her work, and that ever since said operation she had suffered with soreness in her left side; that she suffered a "stuffed" pain in her left side; that she was bloated and her left side felt like it was stuffed full of something; that when she drew a long breath she suffered severe pains in her left side near the scar left by the incision made by Dr. Moore (here she explained other pains in her left side); that she also suffered with severe headaches; that there was no time between Dr. Moore's operation and the removal of the gauze that she did not suffer soreness; that during the time mentioned her abdomen and stomach were bloated, and remained so until the gauze was removed; that the bloat or swelling was about the pit of her stomach downward, and that she suffered a great deal from gas in her intestines and stomach; that since the gauze was removed her condition has been better, and that she has had no swelling in her abdomen or stomach, but that she still suffers with soreness in her left side; that it feels like something pulling in her left side; that, while she has suffered some pain in the same region that she had before the Moore operation, such pains were not the chronic pains suffered before his operation, but that she did have pains in her bladder and painful urination after the gauze was removed, the same as before its removal, but that the pains she suffered in her left side before Dr. Moore's operation were not at all like those suffered thereafter; those suffered after the operation were not cutting pains about the kidney as they were before the operation.

Dr. Nelson testified that he operated on Mrs. Ivey in June, 1920 (the nature of which has already been described), and that she never began thereafter to complain until a few months before the Moore operation; that during said few months she complained of a cystitis, a pain in the bladder, the left side, and a pain in the back, frequent urination, etc.; that he made a diagnosis of her trouble, and concluded that she was suffer-

ing with a stone in her kidney, and he sent her to Dr. Moore for treatment; that in his operation he was assisted by nurses and a physician; that he used sponges in the operation, but no packing sponge or gauze was used; that it was not necessary to use such sponges in the kind of operation performed by him; that in such operation he used only small sponges on a handle for mopping; that these sponges were fastened on what is called a sponge forceps, which holds the sponge; that the sponges used by him were not six inches wide and a foot long, they were smaller in size; that sponges used by him were practically 8x9 inches, practically square; that sponges used for packing are much larger than those used by him in his operation on Mrs. Ivey, probably four times as large; that he used none of the large sponges, but only the small ones; that he left no sponge or gauze in the body of Mrs. Ivey; that prior to his operation Mrs. Ivey had never been operated upon, to his knowledge, nor since then, except the operation by Dr. Moore; that no sponges are used at the Nacogdoches Hospital except the small sponges above mentioned and the packing sponge; that he did not use any of the large sponges in his operation on Mrs. Ivey; that the sponges used by him were securely fastened to a sponge forceps as they were being used, and were never let loose; that after Mrs. Ivey returned to Nacogdoches after the Moore operation she developed some pain in the left side in the region of the incision made by Dr. Moore, together with some more bladder symptoms; she had chills or rigors; that these troubles convinced him that she had an infection of the left kidney; that he supposed that the kidney had not gotten healthy since the Moore operation.

Mrs. F. R. Tucker testified:

"I am Mrs. F. R. Tucker, and reside at Nacogdoches. Dr. Tucker is a physician and surgeon. I am acquainted with the Mound Street Hospital at Nacogdoches; we established it and owned it for several years. * * * I was always in the operating room, and performed the duty as sterile nurse. In performing an operation at that hospital they do not keep a sponge count; that has never been the practice there, because they never turn a sponge loose; they fasten them. That is true with all the surgeons there. Dr. Smith and Dr. Tucker and Dr. Nelson, they all fasten their sponges with a hemostat. They hang the hemostat onto the outside of the wound, and do not turn the sponge loose. That is the practice of all the surgeons there."

Mrs. Ivey testified that she had never had any operation performed upon her except the one by Dr. Nelson in June, 1920, and the one by Dr. Moore in November, 1921.

The gauze exhibited to the court which passed through the intestines of Mrs. Ivey was shown to be about 8 inches wide and about 32 to 34 inches long, approximately the length of the No. 10 gauze used at the St. Joseph's Infirmary, where Dr. Moore's operation was performed. Mrs. Ivey testified, however, that she had torn a small part of it off in trying to remove it from her intestines.

Dr. Barham, who assisted Dr. Nelson in his operation on Mrs. Ivey in June, 1920, testified to removing the gauze from Mrs. Ivey. He also testified that he kept no record of the matter, and could furnish no material information with reference thereto.

Appellant, Dr. Moore, testified that he performed an operation upon Mrs. Ivey in November, 1921, at St. Joseph's Infirmary, situated in Houston; that before performing the operation he made a diagnosis of the condition of Mrs. Ivey, and had five or six X-rays made, and took her entire history, including the operation performed by Dr. Nelson; that by means of the X-rays he discovered a stone in the left kidney of Mrs. Ivey, but did not discover any gauze, or other foreign substance, in her body; that, had there been an abscess formed around a sponge at the time he made the diagnosis, he would have been able to detect it by examination; that he removed the stone from Mrs. Ivey's left kidney; that in performing such operations as performed by him on Mrs. Ivey sponges of two sizes were used, one a large sponge, put up in packages, each package containing 10 sponges, and the other a small sponge, put up in packages of 40; that the large sponges measure about 31 or 34 inches in length, but before they are packed they are usually 36 inches long; that the small sponges are about one-fourth the size of the large ones; that he used the large sponges in his operation, and when using them he had fastened them to forceps; that after the operation was performed, and before the incision was closed he had one of the nurses to count the sponges so as to see that none were missing, and that all the sponges used by him in his operation were accounted for before the incision was closed; that a sponge left in the abdomen, if it is clean, and becomes encysted, it has the possibility at any time to form an abscess about it and to begin to work its way into either the bladder, the vagina, or into the intestines. He testified, however, that, if a sponge had been left by him in the kidney operation, not in the abdominal cavity, he did not believe that would pass into the intestines; that he had seen perirenal abscesses, that is, abscesses around the kidney, without any sponge being left, and they will finally break through in the back, in the loin, before they will break through in the inside; that he could not recall a single case, out of numbers and numbers of cases of abscesses about the kidneys, that had gone into the intestines; that from the standpoint of medical history and his experience it is not supportable that a suppur-

ating foreign body in the region of the kidney would go into the intestines.

The nurse who had charge of the sponges which went into the operating room at the time of the Moore operation testified that all the sponges taken into the operating room were accounted for before the incision in Mrs. Ivey was closed.

The incision made by Dr. Moore on Mrs. Ivey was on the left side, just above the hip, near the back.

Drs. J. E. Clark, Scardino, E. M. Armstrong, Judson Taylor, Edward Hodges, W. M. Wier, and James A. Hill, all eminent physicians and surgeons, testified that it was their opinion, from their knowledge of the human anatomy, their personal experience, and the medical history of such cases, that a foreign substance left in the kidney region would not work its way into the intestines. While Drs. Gavin Hamilton and B. W. Turner testified practically as did the others, Dr. Hamilton testified further as follows:

"Taking all the symptoms that have been related to me, and adding to that the fact that the surgeon who performed the first operation did not use a laparotomy gauze at all, and for the mopping he used only a gauze 8x9 inches, then I would say that the gauze would have to come from the second operation. I do not know Dr. Nelson—have never met him."

Dr. Turner testified as follows:

"There was one instance in particular about six years ago that I made the examination of medical history to determine this question of gauze being left in a kidney operation. There is recorded an instance of a gauze being left in the right kidney and getting into what we call the duodenum, and being vomited up. I account for that by the relation of the duodenum to the kidney on the right side; it is closer to its proximity. The gauze had to pass through the peritoneum, but that is a fixed point, and that is the way I account for it, the close proximity of the duodenum or lower opening of the stomach being a fixed point, and the kidney a fixed point, and no way to give—no resiliency—and as the abscess eroded it eroded into the bowels, through the peritoneum into the bowels. Of course, it also had to pass through the loose tissue. We don't know that the gauze got into the stomach; it got into the gut just below the stomach and then was vomited up; but that was a very small sponge. It got into that gut by erosion."

We believe that the facts and testimony above stated fairly represent the material evidence upon which the jury found that the sponge was left in Mrs. Ivey by Dr. Moore.

[1] Notwithstanding the high character and reputation of Dr. Moore as a careful and eminent physician and surgeon, we are not prepared to hold, under the evidence shown, that the finding of the jury that the sponge was left in Mrs. Ivey in the operation of Dr. Moore is so against the weight and preponderance of the evidence as to be clearly wrong.

Assuming, as the jury had the right to do, that Mrs. Ivey told the truth when she testified that in a short time after Dr. Nelson had performed his operation on her in June, 1920, she was so greatly improved in health as to suffer no pain until about April or May, 1921, a period of several months, that during such time she was able to do and did do all of her cooking, sewing and house cleaning, and to also care for her children, and that, as she was able to do such work, she discharged her servant, and assuming, as the jury had the right to do, that Dr. Nelson told the truth when he said he used no such sponge in his operation as passed from the intestines of Mrs. Ivey, and accepting as true the testimony of Dr. Moore that before he performed his operation he had X-rays made of Mrs. Ivey, and thereby discovered a stone in her left kidney, and also his testimony that had there been an abscess formed around a sponge at the time he made his diagnosis and examination he would have been able to detect it by examination, we think the jury might have reasonably concluded that the sponge which passed from the intestines of Mrs. Ivey was not in her body at the time Dr. Moore made his diagnosis and X-ray examination, just before he performed his operation, and, as a corollary, that the sponge was left in Mrs. Ivey in the Moore operation.

The finding of the jury that the sponge was left in Mrs. Ivey in the Moore operation is not so against the weight and preponderance of the evidence as to require us to set the same aside.

With reference to the contention of counsel for appellant that the finding of the jury that the sponge was left in the body of Mrs. Ivey by appellant was based upon a presumption drawn from conflicting evidence, and that their finding that appellant was guilty of negligence in not removing the same before closing the incision made by him was based upon the presumption first mentioned, and therefore the last-mentioned finding was a finding which had for its basis a presumption based upon another presumption, we hold that the finding of the jury that the sponge was left in the body of Mrs. Ivey in the operation performed by Dr. Moore was not based upon a presumption only, but rather upon facts testified to by certain witnesses, which negatives that it was left by Dr. Nelson, and which, if true, proves the existence of the fact found by the jury in the first instance.

The positive testimony of Dr. Nelson that he did not leave the sponge in Mrs. Ivey—that he had no sponges such as passed from Mrs. Ivey—fortified by the corroborative testimony of Mrs. Tucker as to how sponges were uniformly used at the hospital where

the Nelson operation was performed, and reinforced by the testimony of Mrs. Ivey as to the state of her health for months after the performance of the Nelson operation, is sufficient to remove from the realm of circumstantial evidence the question as to whether Dr. Nelson left the sponge in Mrs. Ivey.

"Absence of direct evidence as to who left a sponge in the cavity when closing an incision after an operation does not require direction of a verdict in favor of the surgeon who performed the operation, if there are facts and circumstances in evidence sufficient to warrant a finding by the jury upon that question." Harris v. Fall, 177 Fed. 79, 100 C. C. A. 497, 27 L. R. A. (N. S.) 1174.

[2] Since the jury has found upon sufficient evidence that Dr. Moore left the sponge in Mrs. Ivey, we think that a further finding that such act constituted negligence on the part of Dr. Moore necessarily follows.

In 21 R. C. L. p. 388, in stating the rule applicable to the matter under discussion here, it is said:

"Probably the most common instance of malpractice which is brought into the courts arises out of surgical cases where the physician or attendant has left a sponge in the wound after the incision has been closed. · That this is plainly negligence there is no doubt at all; and it matters not that many physicians testify that the best surgeons sometimes leave a sponge, or some other foreign substance, in the bodies of their patients, for this is testimony merely to the effect that almost everybody is at times negligent. * * * Surgeons cannot relieve themselves from liability for injury to a patient caused by leaving a sponge in the wound after an operation by the adoption of a rule requiring an attending nurse to count the sponges used and removed, and relying on such count as conclusive that all sponges have been accounted for."

See Akridge v. Noble, 114 Ga. 949, 41 S. E. 78; Gillette v. Tucker, 67 Ohio, 106, 65 N. E. 865, 93 Am. St. Rep. 639; Palmer v. Humiston, 87 Ohio, 401, 101 N. E. 283, 45 L. R. A. (N. S.) 640; Hackler v. Ingram (Tex. Civ. App.) 196 S. W. 279.

[3] We now come to consider the question as to whether the judgment should be reversed because of the misconduct of the jury. The particular acts of misconduct charged are (1) that C. R. Clark, a member of the jury, while the jury were considering their verdict, stated substantially that he had a neighbor who had a small piece of bone and a piece of gauze left in her nose by Dr. Ellis from which she suffered, and that in her suit she had recovered a judgment for $15,000; (2) that the jury discussed the probability that Dr. Moore had insurance to protect himself against loss in such cases; (3) that the jury discussed the probability that the plaintiff's attorney would get a portion of any recovery which they might award; (4) that the jury referred to the fact that some doc-tor was threatened with suit in an appendicitis case, and that a verdict against Dr. Moore might have a beneficial effect as tending to make doctors more careful.

All the jurors except three were examined by the court upon motion for a new trial, and it was shown that the recovery of $15,-000 awarded by a jury against Dr. Ellis was mentioned by Juror Clark, as charged, and that some of the jury heard the statement made by Clark; that the matter of attorney's fees was discussed by one or more members of the jury before the verdict was rendered, in the hearing of some of the jurors; that the probability that Dr. Moore had insurance was also discussed by one or more of the jurors in the hearing of others, and that some juror suggested that, if a verdict was rendered against Dr. Moore, it would probably make other doctors more careful.

After the trial judge had heard the testimony of the nine jurors called as witnesses he overruled the motion for new trial.

Juror E. Goldberg testified that he heard one of the jurors during their deliberations state that some woman had recovered a jury verdict against Dr. Ellis for leaving a small bone and a piece of gauze in her nose; that he heard some one mention that probably Mrs. Ivey would have to pay her attorney 50 per cent. of any amount awarded to her; that some one mentioned that probably Dr. Moore carried insurance to cover such accidents or happenings; that some juror stated that some doctor had been threatened with a suit in an appendicitis case, and that he (the juror) kept the suit from being brought, and that he heard some one say that a judgment against Dr. Moore would probably make doctors more careful; that the statements mentioned were made before the verdict was concluded, and in the hearing of some of the jurors. On being questioned by the trial judge, he said that he did not know whether hearing these things had any effect on him or not, but that he could not say that it did; that the statement made with reference to Dr. Moore having insurance had no effect on him, that it made no difference as to whether he had insurance or not; that. they were governed by the evidence; that he was doing his best to reach a conclusion according to the evidence. He testified further that he did not know how the parties who made these several and various statements stood as to the amount of damages; that about four of the jurors stood for an award of $25,000, but he could not say who they were, or whether any one of them made either of the statements he had mentioned; that at the beginning he was against awarding any damages; that two were for $5,000, one for $15,000, one for $12,500, and that he could not recall what the others wanted to award; that the matter of insurance was mentioned one time only, and was not discussed. He testified on cross-examination

that he made the affidavit on file; that he had talked to Mr. Cook, attorney for Dr. Moore, about the conduct of the jury, and gave him the information from which the affidavit was prepared; that the affidavit was brought to him already prepared by a young man by the name of Bradley, that the comparative sizes of the gauzes mentioned in the Ellis case had nothing to do with the amount he finally agreed to award, nor did the mention of the insurance matter have any such effect, and that he did not think that any of the incidents mentioned as being stated in his presence and hearing had any effect upon him in arriving at the amount of the award. On further questions by the trial judge he said that he was not influenced by anything said in the jury room.

The juror Wappler testified, on cross-examination, that he heard the several matters testified to by Goldberg mentioned in the jury room; that it was after the verdict had been agreed upon that such matters were mentioned; that he did not think such matters influenced him in forming his verdict; that he was influenced only by the facts and the testimony.

Some of the other jurors who testified on motion for new trial said they heard some of the matters mentioned by Goldberg mentioned in the jury room, but that such matters did not influence them in arriving at their verdict; that in forming their verdict they were influenced only by the evidence and charge of the court; and the remaining jurors testified that they did not hear any of the matters mentioned, and that their verdict was based on the evidence and charge of the court. Several of the jurors who heard the matters referred to mentioned testified that they heard none of them mentioned until after the verdict had been reached, prepared, and sealed.

The juror Holcomb testified that when the jury went out they took one ballot, and the several amounts favored by the several jurors ranged from $5,000 to $15,000, except that Mr. Goldberg did not, at first, favor finding any damages; that he (the witness) laid the gauze which passed from Mrs. Ivey and the No. 10 gauze out and showed Goldberg what he thought was right, and that thereafter Goldberg agreed to the verdict rendered, and that after the verdict was rendered he heard Goldberg say that he (witness) was the man that convinced him by a comparison of the gauzes.

We think the trial court could well have concluded from the testimony adduced on the motion for new trial that no juror of the commonest sort of honesty and intelligence could have been induced, by the mention of the matters testified to by some of the jurors, to find that Dr. Moore left the sponge in Mrs. Ivey; they had no tendency to throw any light on the questions as to who left the sponge in her body. We also think that, when the evidence on the motion is taken and considered as a whole, it justified the trial judge in concluding that the suggestions shown to have been made in the jury room, of which complaint is made, did not influence the jury or any of them in arriving at their verdict.

[4] The statute (article 2021) leaves it to the discretion of the trial court to set aside a verdict for misconduct of the jury, and appellate courts are authorized to disturb the verdict where the trial court has refused a new trial only in cases where it is shown that the trial court has abused the discretion reposed in it by the statute. H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606; Ry. Co. v. Smithers (Tex. Civ. App.) 228 S. W. 637; Marshall Mill & Elevator Co. v. Scharnberg (Tex. Civ. App.) 190 S. W. 229; Gulf St. Tel. Co. v. Evetts (Tex. Civ. App.) 188 S. W. 289; M., K. & T. Ry. Co. v. Andrews (Tex. Com. App.) 206 S. W. 823; Fox v. Ry. Co. (Tex. Civ. App.) 186 S. W. 852.

We have also reached the conclusion, after considering the testimony of the jurors as a whole, that we would not be justified in interfering with the action of the trial court in refusing a new trial upon the grounds of the alleged misconduct of the jury.

For the reasons expressed, the judgment is affirmed.

Affirmed.