ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. ROBERTS. (No. 257.)

(Court of Civil Appeals of Texas. Beaumont. June 25, 1917.)

1. NEW TRIAL ⟊144—MISCONDUCT OF JURY —EVIDENCE—SUFFICIENCY.
  On motion for a new trial, evidence *held* sufficient to show that jurors improperly discussed that plaintiff would have to pay a large attorney's fee, and that their verdict was influenced thereby, necessitating a new trial.
  [Ed. Note.—For other cases, see New Trial, Cent. Dig. § 298.]

2. NEW TRIAL ⟊44(3) — ABUSE OF DISCRETION—EVIDENCE.'
  Where, on a motion for new trial for misconduct of jurors, in an action for personal injury, the jurors were examined, and their testimony shows that it was discussed among them that plaintiff's attorney would get a large fee, and one of the jurors admitted that he considered it in his verdict, it was an abuse of discretion of trial court to overrule the motion.
  [Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 82–84.]

3. APPEAL AND ERROR ⟊978(3)—ABUSE OF DISCRETION—REVIEW.
  Where the undisputed evidence showed misconduct of the jurors in reaching their verdict, the trial court's refusal to grant a new trial is an abuse of discretion, reviewable on appeal.
  [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3870.]

4. MASTER AND SERVANT ⟊274(4)—INJURIES TO SECTION HAND—EVIDENCE—ADMISSIBILITY.
  In a section hand's suit against railroad employer for injury received when the hand car upon which he was riding collided with a cow on the track, evidence that the right of way was not fenced was admissible for the purpose of showing that foreman might have anticipated that cattle would be upon the track, and that a

hand car running at a high rate of speed, as alleged, might come in contact with cattle.
  [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 944.]

5. EVIDENCE ⟊471(17) — OPINIONS — RECKLESS CONDUCT.
  In a section hand's suit against a railroad employer for injury received when the hand car upon which he was riding collided with a cow, evidence that the conduct of the foreman was reckless, etc., was inadmissible.

6. EVIDENCE ⟊471(13) — OPINIONS—BODILY CONDITION.
  In a section hand's suit against railroad employer for injury received when the hand car upon which he was riding collided with a cow on the track, statements to the effect that his injury caused him suffering and pain, and that they prevented his being able to get around, etc., were not admissible.
  [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2167.]

7. EVIDENCE ⟊127(2)—RES GESTÆ—EXCLAMATIONS OF PAIN.
  In section hand's suit against railroad employer for injury received when the hand car upon which he was riding collided with a cow on the track, his exclamations of pain and suffering, which were explanatory of his condition, and made to show pain and suffering at the very time, were admissible.
  [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 379.]

Appeal from District Court, Angelina County; L. D. Guinn, Judge.

Suit by Jack Roberts, by next friend, Zemeriah Roberts, against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Reversed and remanded for a new trial.

Denman & Thomas, of Lufkin, and Marsh & McIlwaine, of Tyler, for appellant. S. H. Townsend, of Lufkin, for appellee.

HIGHTOWER, Jr., C. J. We take the following statement, showing the nature and result of this suit from the brief of appellant, which is conceded by appellee to be correct.

"This suit was instituted by appellee, Jack Roberts, by his next friend, Zemeriah Roberts, against appellant, St. Louis Southwestern Railway Company of Texas, in the district court of Angelina county, to recover damages for personal injuries received by him while a laborer in its section gang; said injuries having been occasioned by the alleged negligence of appellant in permitting a hand car upon which appellee was riding to come in collision with a cow which got upon the track in front of said hand car. The trial was to a jury, and, in keeping with the verdict, judgment was entered against appellant for $2,500."

We have carefully gone over the record in this case, and we have concluded that appellant's eighth assignment of error, which complains of the misconduct on the part of the jury, while deliberating upon their verdict, must be sustained, and the judgment of the trial court reversed, and the cause remanded. We shall therefore dispose of that assignment in the beginning.

This assignment complains, in substance, that the jury, or some of them, before a ver-

---

⟊For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

dict had been reached, discussed and considered the fact that plaintiff's attorneys would get part of the judgment that might be rendered in his favor against appellant, and that the jury, or some of them, were influenced by such discussion, and caused to render a verdict in favor of the plaintiff for a larger sum than they would have rendered in his favor had not the question of attorney's fees been considered and discussed.

In order to a proper disposition of this assignment, it becomes necessary to here state what was said among the jurors on this point, while deliberating upon their verdict; and in view of the state of the authorities, dealing with questions of this character, as we now find them to be, we have deemed it proper to set out at some length what this misconduct on the part of the jury was, and, in doing so, we take appellee's statement about this matter, as contained in the brief of his counsel. Attached to appellant's motion for new trial were the affidavits of two of the jurors, W. W. Stephens and Coke Murphy, and both of these jurors also testified in person on the motion for new trial, as did also the juror H. W. Day. Juror Stephens testified in person, substantially as follows:

"Q. I believe you were one of the jurors who sat and tried the case of Jack Roberts v. The St. Louis Southwestern Railway Company of Texas? A. Yes, sir. Q. Tried at this term of court, and on or about the 2d or 3d day of November of this year? A. Yes, sir; I don't remember the date, but I was a juror in that case. Q. I will ask you if, while you were in the jury room deliberating upon your verdict. the question of attorneys of the plaintiffs—that is, I mean, the question of the attorneys' fees— were discussed, and what that matter discussed by the jury or any member of the jury was? A. Yes, sir; I think some of them spoke about the attorneys' fees; I am sure I heard that. Q. Do you remember what was said as to what the attorneys' fees would be? A. Yes, sir; I think about half, some of them stated—thought that the attorneys would get about half of the boy's recovery. Q. Do you remember the name or names of any of the jurors who discussed that? A. No, sir; I don't. Q. Do you know about how many of the jurors discussed it? A. Well, several of them spoke about it. Q. Now, I will ask you if you heard the jury, or any member of that jury discussing the question of attorneys' fees, if they stated the boy would get half; that is, the plaintiff would get half, and the attorneys would get half—in your hearing, Mr. Stephens, was that discussed? A. I don't remember all, but it seems that something like that was said. Q. I will ask you if you heard any member or members of that jury discuss any question of any attorneys' fees in that case? A. Yes, sir; I heard them discuss about the attorneys would get part of it, they supposed they would, but I could not tell you who that was; several of them were discussing, first one and another, about it. Q. I will ask you if any of the members of that jury stated how much the attorneys would get? A. Yes, sir; some of them put it down at $1,000. Q. I mean what the attorneys would get, Mr. Stephens? A. Well, about half—I think about half—that's what I understood; some said he would get half. Q. That the attorneys would get half? A. Yes, sir; that's the way I understood it. Q. That was the understanding of the jury? A. I understood it that way. Yes, sir; I am just stating

that I understood it that way. I don't know what the others understood. Q. You understood the attorneys would get about half? A. Yes, sir. Q. I will ask you if that discussion of attorneys' fees by some members of that jury had anything to do with you in rendering that verdict in favor of Jack Roberts and against the St. Louis Southwestern Railway Company of Texas in the sum of $2,500? A. Yes, sir; I think so. I believe the boy ought to have had something, but I didn't think he should have that much. I thought the boy was entitled to something, but thought that was more than he was entitled to. Q. If that question of attorneys' fees hadn't been discussed at all, and hadn't been brought up by any members of the jury, would you have rendered a verdict in favor of Jack Roberts for $2,500? A. No, sir; I don't believe I would. Q. You state, then, that that question or discussion influenced you in rendering a verdict for $2,500? A. Yes, sir, to a certain extent.

"Cross-Examination by Appellee.

"Q. You were sworn as a juror before you went on the jury to try this case? A. Yes, sir. Q. You were sworn to try the case according to the law and evidence? A. Yes, sir. Q. And that is the way you did try the case the best you understood it? A. Yes, sir; of course, I agreed to the verdict, and about dividing it up. Q. You tried the case according to the law and evidence in the case as you understood it? A. Yes, sir; but that of course— Q. And there was no evidence offered at all about any attorneys' fees in the case, was there? A. No, sir; nothing said about it by any witness in the case —just mentioned by some in the jury room. Q. You never heard any testimony at all with reference to that? A. No, sir; I didn't know anything about that—just heard some of them discussing it in the jury room. Q. Do you know who approached that subject or brought it up? A. No, sir; I don't. Q. Do you know—do you remember what time the case was submitted to you, at what hour you went to the jury room in the case? A. It was about night; I think about night, I think. Q. You rendered a verdict before noon on the next day? A. Yes, sir; I think just about 11 o'clock the next day.

"Redirect by Appellant.

"Q. I will ask if there was any other discussion at all among any members of that jury relative to any other matter, other than the evidence in the case? A. Yes, sir; they discussed a right smart about first one thing and then another; about the boy and one thing and another. I don't know what all. Q. I will ask you if there was any discussion about a compromise? A. Yes, sir; I heard some speak about that—some of them spoke about that being too much, and some said the lawyers would compromise it, something like that; I don't remember just what. Q. They stated if you would give him that much the lawyers would compromise it? A. Yes, sir. Mr. Collins, for the plaintiff: That question is leading, and we object to it. Court: Yes, sir; I would not lead him."

At this point the juror Stephens was shown the written affidavit which he had made, and which was attached to appellant's motion for new trial, and the examination continued:

"Q. Is that your signature? A. Yes, sir; it looks like mine. Q. You swore to that before me, did you not? A. Yes, sir; I think so. Q. At that time you read it over? A. No, sir; I didn't read it. Q. Didn't I read it to you? A. I believe so. Q. And you signed it? A. Yes, sir. Q. And you understood at that time the contents of that matter—that instrument? A. I don't know all about that. I guess— Q. You

stated in there that you would not have agreed to the verdict of $2,500 if it hadn't been for the question of attorneys' fees influencing you; is that true? Mr. Feagin, for plaintiff: We object to that method of questioning this witness, if the court please. Court: You might let him stand aside and read it over, and use some other witness now, on account of time. Mr. Denman, for the defendant: Well, that is all right; he can stand aside and read it over to himself, and we will use Mr. Day."

Mr. Day, being called to the stand, testified:

"Q. What is your name? A. A. H. W. Day. Q. You were one of the jurors who tried the case of Jack Roberts v. St. Louis Southwestern Railway Company? A. Yes, sir. Q. Tried at this term of court? A. I was one of the jurors. Q. Mr. Day, after the jury went to the jury room to deliberate on their verdict, I will ask you if any discussion came up, as far as you know, about any matter that was not before you in evidence? A. Well, it wasn't before us in evidence. No; it wasn't before us in evidence, and it was about what the boy would get if it was compromised or paid; that is, according to whatever verdict we should give, what part the boy would get. Q. Just what discussion was there along that line among the jurors, Mr. Day? A. Well, I don't know hardly, but it was figured if we rendered that verdict the boy would get about half. Q. That was discussed then? A. Yes, sir; some. Q. Was there anything else discussed by the jury, or any member of the jury, besides the question of attorneys' fees? A. Well, now, we discussed the boy, as to his injury, and what the boy was worth, whether he was injured at all or not, and such as that. Q. I will ask you if there was anything that influenced you in any way in arriving at that verdict, other than the evidence? A. Yes, sir; I believe so. Q. Well, what was it, Mr. Day? A. Why, we figured it this way, that we would be tied up there indefinitely, the way things stood, without a compromise; there was 11 of us one way and just one the other way. Q. How was that, if you remember—what did you say about 11 being one way and one being the other way? A. I said 11 of the jurors was one way and just one the other way, and finally 11 agreed to give him $2,000, and one wanted to give him $5,000, and he wanted to answer each question against the railroad, and we wouldn't do that—didn't want to. Q. I will ask you whether or not any member or members of the jury stood below or lower than $2,000 at any time? A. Yes, sir; at first several of them were for $1,000. Q. Was any lower than $1,000? A. I don't know. That matter was discussed thoroughly, but I think the lowest one was for $1,000. Q. Just go ahead and tell about being tied up there? A. Well, we discussed it nearly all Friday night and Saturday morning, and hadn't got together, and we never thought of that compromise at all —just thought we couldn't agree; but we all took a walk Saturday morning around the streets, just walking around, and some one spoke to me—some member of the jury spoke to me and said, 'I think we can get up a compromise;' and I said, 'Well, I would rather compromise than to be tied up.' I don't remember now just who it was that mentioned that to me—it was some member of the jury; and, before we got back to the courthouse a compromise was agreed on, and we came on back down here, and just a little while before dinner we returned the verdict. Q. What led you to believe you would be tied up indefinitely? A. Well, we learned that Judge Guinn's mother was sick, and that he could not be here, and I didn't know where any special judge was elected or anybody to receive our verdict or not, or anything about that. We learned that Judge Guinn's mother was dangerously ill, and I have later learned that she died. Q. At that time did you know the judge had gone away? A. Yes, sir; we understood he went off on the 7 o'clock train—on the 7:40 train. Q. Did the fact that you knew the judge was gone and wasn't there to receive the verdict influence you any in rendering that verdict for $2,500? A. No, sir; I don't think it did, because I didn't know just when he would be back, and I don't think that had anything to do with me in rendering the verdict; in fact, I would not consider the difference between us of such awful vital importance. There was not much difference between $2,000 and $500, and we just agreed to come up to $2,500. Q. You say the fact that you understood the judge was gone and you were apt to be tied up indefinitely on that account didn't influence you? A. No, sir; the judge being away didn't influence me at all. Q. But the fact otherwise that you thought you would be tied up indefinitely did influence you, I believe you said? A. I didn't see any chance of a verdict until just a few minutes before we were together. Q. What caused you to think you would be tied up indefinitely? A. Well, that was Saturday, and Sunday was coming, and I thought possibly it might be Monday before anybody would be here to receive the verdict.

### "Cross-Examination by Appellee.

"Q. You were sworn before you went on this case as a juror? A. Yes, sir. Q. You tried the case according to the law and evidence of the case, as you understood it? A. Yes, sir. Q. And you tried the case according to the law and the evidence as you understood it? A. Yes, sir. Q. There wasn't any testimony about any attorneys' fees in the case? A. Yes, sir; it was discussed. Q. I mean there was no testimony about that in the case? A. No, sir; I don't know that there was—I don't think there was, and I don't remember how come it to come up nor anything about it much. Q. You have sat on juries a good deal in civil cases? A. Yes, sir; both kinds. Q. Most all verdicts in civil cases are rendered on an agreement among members of the jury; that is, there is often a difference between them, and they get together? A. Yes, sir; I never did know one to get together any other way except by agreement. Q. It has been your experience that that is the way they get together in civil cases? A. Yes, sir; and criminal cases, too.

### "Redirect.

"Q. The question of attorneys' fees was discussed in the jury room among the jury by members of the jury? A. Yes; sir, some; but I don't know just who it was now."

The juror Coke Murphy testified:

"Q. Your name is Coke Murphy? A. Yes, sir. Q. Are you one of the jurors who tried the case of Jack Roberts v. St. Louis Southwestern Railway Company of Texas? A. Yes, sir. Q. Tried at this term of court about the 2d or 3d day of November? A. Yes, sir. Q. Now, at the time the jury were in the jury room deliberating on the verdict, I will ask you if there was any discussion of anything or any fact that wasn't testified to by the witnesses or didn't appear in the evidence? Court: Was the question of attorneys' fees discussed? Let's get down to the question, Mr. Denman. Witness: Yes, sir; I think so. Q. Just state what that was, as far as you know? A. Well, several of them discussed it with reference to what the boy should have and what he would get in the usual way of paying an attorney; several thought the attorneys would probably get about half of whatever amount we allowed the boy. Q. I will ask you if there was any discussion of anything else, if there was any other thing or facts discussed other than the question of attorneys' fees, and that influenced the jury in any way in

so far as you know, Mr. Murphy? A. Well, I don't know that it influenced the jury any. I know we understood some way that Judge Guinn was going away, and we thought if we didn't reach a verdict that afternoon or early the next morning we might be tied up for several days. Q. Now, with reference to the discussion of attorneys' fees, was there anything said as to how much the boy would get of the recovery and how much his attorneys would get? A. Why, I don't know that any of them stated any definite amount; quite a few of us thought if the boy could get $500 that would be ample for him. Q. You say some of you thought that would be enough? A. Yes, sir. Q. And now I will ask you why it was you agreed on $2,500 if you thought $500 would be ample? A. Well, as to that, I couldn't answer for any one except myself. Q. Well, just state about yourself, why you did it? A. Well, I was anxious to get loose, and it didn't seem like we could get the other party to come to any other decision at all. Some of us thought at first we would give him $1,000, and I thought $1,000 would be the outside figure that I would allow him, and I didn't want to give any more than that at first, and I think some of us discussed a verdict for $1,000 before we ever voted. Q. Now, what amount did you think the attorneys would get? A. Well, I didn't know, but I thought it was usual for the attorneys to get about half, and that was mentioned in a general way. I thought the attorneys would get half of whatever we allowed the plaintiff. Q. You thought if you gave a verdict for $2,500, that the boy would get $1,250 of that amount, and the attorneys $1,250? A. That was my idea. Q. And, but for that fact, you would not have come to the $2,500 verdict, would you, Mr. Murphy? Mr. Collins, for the plaintiff: We don't think he should lead him. Court: No, sir; don't lead him. Q. I will ask you if this fact had anything to do with you agreeing to the verdict for $2,500? A. I think I came to the $2,500 more to get loose than anything else. Q. You don't think the fact that you thought the attorneys would get half of the recovery had anything to do in the way of influencing you in the case, either one way or the other? A. No, sir; I think not. Q. Now, you said something about thinking that probably you would be tied up indefinitely? A. Yes, sir; if we didn't reach a verdict. We knew the mission Judge Guinn went to Lufkin on, but I knew or thought that in the course of twelve hours we could get him down here if we agreed on a verdict; otherwise we would be tied up until he returned. A. And did that fact or not influence you in rendering a verdict for $2,500, Mr. Murphy? A. No, sir; I couldn't say that it did, because I found out after Judge Guinn left he had appointed Judge Robb to receive our verdict.

"Cross-Examination.

"Q. Nothing but the law and evidence influenced you in arriving at this verdict, Mr. Murphy? A. Well, the fact that one man wouldn't come to the majority and— Q. You all went up some? A. Yes, sir. Q. Did you regard that as part of the law in the case? A. I never thought anything about that. Q. Did you regard it as part of the evidence in the case? A. No, sir; I didn't think so. Q. You know you were sworn to try this case according to the law and evidence of the case and in the case? A. Yes, sir; we all know that. Q. And were you influenced by anything in rendering that verdict, except the law and evidence? A. No, sir; I don't think I was.

"Redirect.

"Q. Why was it that you agreed on a $2,500 verdict when you thought $500 was ample for the boy? A. Well, as I said before, it didn't seem we could ever get the party that was hold-ing out for $5,000 down any. He wouldn't come to anything less than $5,000 that night, but next morning.some time it was whispered around that he would come to $2,500 and no less."

Juror Stephens, being recalled to the stand, further testified:

"Q. You have read over that affidavit? A. Yes, sir. Q. And it was signed by you? A. Yes, sir; of course there is a word or two in there that I didn't thoroughly understand, but the most of it is just like I stated, I think. Q. The contents of that affidavit is correct then, in a general way; that is, the substance of it is correct? A. Oh, yes, sir. Mr. Denman, attorney for defendant: Now, we want to introduce this affidavit in evidence. Mr. Collins, for defendant: To which we object. Court: It is overruled."

Thereupon the affidavit of the juror, which he admitted to be substantially correct, was introduced in support of the motion, reading as follows:

"The State of Texas, County of Angelina.

"Before me, the undersigned authority, notary public in and for Angelina county, Texas, on this day personally appeared W. W. Stephens, to me well known, and who, after being by me duly sworn, stated: That he was one of the jury which sat in and tried the case of Jack Roberts, by next friend, v. St. Louis Southwestern Railway Company of Texas, No. 3080 on the docket of the district court of Angelina county, Texas, which said case was tried, that is, the verdict rendered, and returned, on the 4th day of November, 1916; that, while the jury was in the jury room deliberating on their verdict, a discussion arose as to the question of attorneys' fees, and several of the members of the jury stated that the attorneys for plaintiff would get at least half of what the boy got, that was the custom in such cases; this question of attorneys' fees was discussed at length by six or seven of the jury to my personal knowledge, and it was told to me that the lawyers would get half; this knowledge or information or discussion led and influenced me to agree to a verdict of $2,500 for the plaintiff, which was against my wishes and too great a verdict in my opinion, and not in accordance with the evidence at the trial, but I came to or went up to $2,500, so that the jury discussing the question of the railway company compromising with the lawyers and plaintiff, and stated that if the jury gave him that sum that the plaintiff and his lawyers and the railway company would get together and settle amicably, but that if a smaller sum was given they would not settle for so much; that this fact led and influenced him to agree to the verdict as rendered, which was against his wishes, and which he would not have agreed to if the members of the jury had not told him that the lawyers would get half, and that the railway company would settle if they gave the boy $2,500; that the jury stated that the county was being put to a great expense in their staying there, and that they ought to get through; that this also led and influenced him to agree to the verdict rendered; that said verdict did not reflect his true verdict, and was against his wishes, and but for the fact that several members of the jury stated to him and in his hearing that the lawyers would get half, and that a settlement would be had if they gave him the sum of $2,500, he would never have agreed to such verdict.

"[Signed]   W. W. Stephens.

"Sworn to and subscribed before me this the 7th day of November, A. D. 1916.

"[Signed]   Kester W. Denman,

"Notary Public, Angelina County, Texas."

The foregoing testimony, being that of the jurors Stephens, Day, and Murphy, was all

that was before the court on the question of misconduct of the jury, the other nine members of the jury not being accounted for by either side.

[1] Now, the question for decision is, does this evidence show, without dispute and with reasonable certainty, that the question of the amount of plaintiff's attorneys' fees was discussed by the jury while deliberating upon their verdict, and before their verdict was reached; and also does it show, without dispute and with reasonable certainty, that the jurors who sat in this case, or any of them, were influenced by such discussion, and caused thereby to render a verdict in favor of appellee for a greater amount than would have been rendered in his favor had not such discussion and consideration by the jury occurred? We think that candor compels an affirmative answer.

If the discussion as to attorneys' fees occurred, which must be admitted, because it is absolutely without dispute, then, of course, there can be no question regarding its impropriety, and that question is not an open one in this state. Every opinion emanating from every appellate court in this state, which has ever spoken on this question, holds that attorneys' fees in matters of this kind are not recoverable, and are not proper to be considered by juries in reaching verdicts; and some of the courts, including the Supreme Court, speaking through Chief Justice Brown, have emphatically said that such conduct as this is not only improper, but that it is highly reprehensible, and that jurors who indulged in such conduct should be promptly punished for same. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606.

[2] It is not contended by appellee that the discussion by the jury of the question of attorneys' fees complained of was not improper, but appellee contends that since the motion for new trial on this ground was addressed to the sound discretion of the trial judge, and his discretion having been exercised, and he, in the exercise of that discretion, having overruled the motion, the ruling is conclusive and binding on this court, even though it may be made clear to this court that the trial court abused his discretion in overruling the motion. We cannot agree to this contention by appellee, and while we concede that this ground of the motion for new trial was a matter resting within the sound discretion of the trial judge, yet we also hold, though reluctantly, that it is made clearly to appear, by the evidence of the jurors Stephens, Day, and Murphy, and more especially by Stephens, that the trial court abused his discretion in overruling this motion.

Appellee, through his energetic counsel, in support of his contention that this court cannot set aside or review the action of the trial court in this matter, has cited the following authorities: H. & T. C. Ry. Co. v. Gray, 137

S. W. 729; H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606; Telephone Co. v. Evetts, 188 S. W. 289; Railway Co. v. Hagen, 188 S. W. 954; M., K. & T. Ry. Co. v. Brown, 140 S. W. 1177; Fox v. Ry. Co., 186 S. W. 858; G., H. & S. A. Ry. Co. v. Pingenot, 142 S. W. 95.

We have read each and all of the above authorities, and have reached the conclusion that not one of them sustains the broad proposition contended for by counsel for appellee.

In Railway Co. v. Gray, first cited, the Austin Court of Civil Appeals, speaking through Judge Jenkins, very briefly disposed of an assignment of this character, and said that the fact that a juror had mentioned in the jury room, while the verdict was being discussed, that the plaintiff ought to have a verdict for $50,000, for the reason that his attorney would get half of his recovery, would not justify that court in holding that the trial court abused its discretion in refusing a new trial; still, it is not made to appear from the opinion in that case what the extent of the discussion was, nor does it appear that any juror was influenced to return a larger verdict against the appellant than would otherwise have been returned but for the mentioning of such matter before the jury, and therefore we do not regard that opinion as sustaining appellee's contention. Judge Jenkins said, too, in that opinion, in effect, that such expression on the part of the juror in that case was merely the expression of an opinion on his part, and was not the statement of any fact, and that, therefore, the matter, seemingly, was of little importance. In so far as the statement by the juror in that case, or in any other case, of an opinion as to what plaintiff's attorney would get, is concerned, we cannot see what difference there would be between the opinion of the juror expressed to his fellows on the jury and the positive statement of such juror as to what the attorney would get; because the material question, it seems to us, would be whether such improper discussion was had, and whether the jury, or any member of it, was influenced by such discussion, to the prejudice of appellant. Application for writ of error to the Supreme Court was made in that case, and the Supreme Court, in denying the application, delivered a brief written opinion showing that the Supreme Court denied such writ, not on the ground that the trial judge's discretion in overruling the motion for new trial could not be reviewed and reversed on appeal, but the Supreme Court denied the writ of error in that case on the ground that it was not made clearly to appear to that court that the trial judge did, in fact, abuse his discretion in that case. See 105 Tex. 42, 143 S. W. 606. Judge Brown, speaking for the Supreme Court, said:

"We had doubt as to the authority of this court to review the ruling of the trial court upon

the motion, so far as based upon the evidence of the jurors, and requested counsel for each party to furnish arguments, to which they responded by able and helpful discussions of the question. After proper consideration given to the briefs furnished, we conclude that the 'discretion' expressed in the act above copied is upon the same level with the discretion vested in the trial judge in many instances, and that we may review its exercise wherein it clearly appears that the rights of the parties have been disregarded. If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury, we would feel inclined to exercise our authority and set it aside; but the judge who tried the case seems to have acted promptly and fairly in the investigation, and we know that he could form safer conclusions from examining the jurors than this court can from the record. There is much in looking at the man who testifies."

The act referred to by Judge Brown in the foregoing quotation was the act of the 29th Legislature (chapter 18), amending the former law relative to the granting of new trials, etc.

As stated above, neither the opinion of the Court of Civil Appeals, nor that of the Supreme Court, in the Gray Case, discloses the extent of the discussion in the jury room complained of in that case, and, indeed, the facts, as disclosed by the opinions of both courts, are so meager that they furnish no guide in the present case.

Were it not for the very full discussion of this question found in the opinion of the Court of Civil Appeals in San Antonio, in the case of Traction Company v. Cassanova, 154 S. W. 1190, we would go at length into the discussion of each of the authorities cited by appellee, for the purpose of showing clearly that the conclusion we have reached in this case is not in conflict with any of them. It will be seen, by an examination of the authorities cited by appellee, that some of them go off on the proposition that it was a disputed fact on motion for new trial whether the alleged improper conduct occurred at all, and in several of such instances the action of the trial judge in overruling the motion was upheld, in keeping with the well-established rule that it was a question of fact for his decision and determination, and he having determined that no such conduct took place, and the evidence justifying such determination, the appellate court would not, of course, disturb his finding; and in the other cases cited it was not affirmatively shown in any of them that the jury, or any member thereof, was actually influenced by such improper conduct to render a larger verdict against the appellant than would probably otherwise have been rendered. Appellee has not cited a single case showing that the trial court's judgment in overruling a motion of this kind was upheld by the appellate court, where it was affirmatively shown to the trial court, by evidence in the proper way, that the jury, or any member thereof, was influenced by improper conduct in the jury room to render a larger verdict against the appellant than would otherwise

have been rendered, and we do not believe that any such case could be cited, but, if so, we would hesitate to follow it. We think that the opinion of Chief Justice Fly, in the case of Traction Company v. Cassanova, supra, announces the correct rule, and it expresses the views of this court so fully that we simply adopt it on this point as our opinion of the law, in disposing of this assignment, without further discussion thereof. See, also, Ry. Co. v. Vivian, 180 S. W. 952; Railway Co. v. McKinnell, 173 S. W. 937.

We cannot tell what influence, if any, was had upon nine of the jurors who tried this case, because, as above stated, they were not produced on the hearing of the motion, nor were their affidavits resorted to; but we do know from the three who testified that the conduct complained of—that is, the discussion of the question as to how much of plaintiff's recovery would go to his attorney—took place, and nobody disputes it; and we know that this conduct was improper, and highly improper; and we know that it was indulged in before a verdict was arrived at; and we know that such conduct was highly calculated to influence the jury in rendering a verdict in favor of appellee for a greater amount than they would otherwise have rendered; and we know, further, from the absolutely undisputed testimony of the witness Stephens, either by positive fact or circumstances, that he, at least, was influenced by such discussion to render a verdict against appellant for a greater amount than he would have done had not the question of attorneys' fees been brought up. We say that the evidence as to these matters is absolutely without dispute, and that there was no issue of fact for the trial court to determine in that connection, because he could not, on the theory of the exercise of his sound judicial discretion, absolutely disregard affirmative and unimpeached testimony on the point, and his action in doing so cannot be held to be the exercise by him of a sound judicial discretion such as this court cannot review. If there had been no question of fact in this connection for the court to determine, or, rather, if there had been any dispute about the facts, then the trial court would have had the right to determine that dispute in favor of the jury's verdict, and this court would not hesitate, in the absence of a clear showing of abuse, to uphold the trial judge's action on such question of fact. But, since it affirmatively appears from the testimony that the juror Stephens, if none others, was influenced, improperly, to render a verdict greater than he knew or felt should have been rendered in this matter, we are compelled to exercise our authority, and hold that the trial judge abused his discretion in not setting aside this verdict. The appellant was entitled to a trial by jury composed of twelve men, and, unless some one or more of that number were legally excused before the verdict was reached, there could have

196 S.W.—64

been no verdict against appellant without the concurrence of all twelve men; and if any man on the jury was influenced to render a verdict finally against appellant in excess of what he believed to be just and right and supported by the evidence and the law, as charged by the trial court, then such verdict against appellant was not the verdict of a jury composed of twelve men, based upon the evidence before the jury and the charge as given by the judge. Suppose it had been alleged in the plaintiffs' petition in this case that he had bound himself to pay one-half or one-third of his recovery, whatever it might be, to his attorneys for their services in his behalf, and should have prayed for such amount as attorneys' fees against defendant. Certainly the trial court would not only have sustained an exception to such allegation and prayer, but would have stricken the allegation from the petition, in order that it might not be brought to the attention of the jury; and suppose that it had been attempted by appellee to introduce evidence to the effect that he had agreed to pay his attorneys any part of his recovery, or any certain sum as attorney's fees for representing him in the action, would it be supposed for a moment that the trial judge would permit any such testimony? If not, why not? Certainly because attorneys' fees constitute no part of the measure of damages in such cases, and therefore would not be proper to be pleaded or shown; and yet it is contended here, in effect, by appellee, that notwithstanding the impropriety of this matter, and notwithstanding, also, the fact that the juror Stephens admits that he, at least, was influenced by this improper conduct to the prejudice of appellant, still this court ought not to disturb the judgment, because it was a matter within the discretion of the trial court. Followed to its logical conclusion, such an argument would bring us to hold that the verdict of the jury in this case, regardless of the extent to which it might have been improperly influenced, would be binding on appellant, provided it got by the trial court, and that this court would be powerless to interfere.

[3] In conclusion, we hold that wherever it is made affirmatively to appear, and without dispute, that a jury has been guilty of misconduct in reaching a verdict, and, further, that it is reasonably certain and undisputed from the evidence on the point that such misconduct influenced the jury, or any member thereof, to render a verdict for a larger amount than would have been rendered but for such misconduct, that the trial judge should in such instance, upon proper motion timely made, set aside such verdict, and grant the complaining party a new trial; and, where the trial judge fails to do so, his failure is reviewable by the appellate courts of this state, and, if these matters clearly appear on appeal, the action of the trial judge will be reviewed and reversed.

As this case must be reversed on account of the misconduct of the jury, above discussed, we shall briefly dispose of the other assignments of error for the information of the trial court upon another trial.

[4] The first and second assignments complain of the action of the court in admitting testimony showing that appellant's right of way was not fenced where the accident occurred, and the contention of appellant in this connection is that its failure to fence its right of way was not negligence as to appellee, and that evidence showing its failure to fence was entirely irrelevant and immaterial.

It is true that appellant was not required by law to fence its right of way, in the discharge of any duty to appellee, but in passing upon the question of the negligence of the foreman in charge of the hand car at the time of appellee's injury, in causing the same to be run at the rate of speed at which the same was being run, we think that it would be relevant and material to show that the right of way was not fenced, because we think that the foreman might reasonably have anticipated that cattle might be upon the track, and that the hand car run at a high rate of speed, as alleged by appellee, might come in contact with such cattle. This is the only reason for the admissibility of such testimony, and for that purpose the court did not err in admitting it.

While the third assignment of error shows that the action of the court there complained of was not correct, at the same time no reversible error in that connection is shown, but upon another trial the court should not permit evidence with reference to the matter there complained of. It is entirely immaterial.

[5] With reference to the fourth assignment of error, we think that the court upon another trial should not permit the introduction of evidence as complained of in this assignment, if the same should be again offered. The acts and conduct of the foreman in charge of the hand car can be affirmatively shown, as well as the rate of speed at which he was causing the car to be run, and from this the jury can draw its conclusion as to whether there was negligence on the part of the foreman, and as to whether he purposely drove the car against the cow on the occasion in question, and the opinion of the witness Young of the conduct of the foreman and his recklessness, etc., should not be put before the jury, which was, in substance, done, as complained of in this bill.

No error is pointed out by appellant's fifth assignment, in view of the issue of emancipation made by appellee in his petition.

By its sixth assignment appellant complains of the action of the court in permitting the witness Vanderhall to testify that plaintiff, while confined to his bed some days after the accident in question, complained of his injury hurting him, and that it bothered him in getting around, and practically the

same question is raised with reference to the testimony of the witness Harmon Wade as complained in the seventh assignment of error.

[6, 7] In connection with these assignments, we think it will suffice to say that the rule is well settled in this state that mere statements, on the part of a person injured, to the effect that his injuries cause him suffering and pain, and that they prevent his being able to get around, etc., are not admissible; but exclamations of pain and suffering, which are explanatory of the plaintiff's condition at the time made, and done to show pain and suffering at the very time, are always admissible, for the reason that such exclamations are said to be outward expressions of inward existing pain. There are some parts of the testimony pointed out in these two assignments that should not have gone to the jury, and we are sure that the learned trial judge, without further discussion of this question by us, will correctly determine what portion of the testimony here complained of should go to the jury upon another trial. Ry. Co. v. Wheeler, 41 S. W. 517; Ry. Co. v. Martin, 26 Tex. Civ. App. 231, 63 S. W. 1089.

The ninth assignment of error has no merit, and the court did not err in refusing to give the charge requested by appellant, complaint of which is there made.

By the tenth assignment of error appellant complains that the verdict of the jury is grossly excessive. As before stated, the amount of the verdict was $2,500, and the record shows there was a sharp contest and controversy in the evidence regarding the extent of appellee's injury. There is evidence for appellant which would tend strongly to show that the injury complained of was not a serious and permanent injury at all, while, on the other hand, testimony for appellee would indicate that the injury is permanent in a sense, and that it will impair the ability of appellee in the future to earn money, etc. However, in view of the disposition that we have made of the case, and the probability of a new trial, it would not be proper, perhaps, for this court to further discuss this assignment.

This disposes of all the assignments, and, believing that the eighth assignment points out reversible error, the judgment of the trial court is reversed, and the cause remanded for a new trial.