WEST LUMBER CO. v. TOMME et al.
(No. 313.)

(Court of Civil Appeals of Texas. Beaumont. May 6, 1918. Rehearing Denied May 15, 1918.)

1. MASTER AND SERVANT ⚫═══278(5)—ACTION—EVIDENCE—NEGLIGENCE.
　　In action by servant for injury from planing machine, evidence *held* to show defendant's negligence.

2. MASTER AND SERVANT ⚫═══281(1)—ACTION—EVIDENCE—CONTRIBUTORY NEGLIGENCE.
　　In action by servant for injury from planing machine, evidence *held* not to show plaintiff was negligent.

3. MASTER AND SERVANT ⚫═══289(28)—ACTION—QUESTION FOR JURY.
　　In servant's action for injury from planing machine, it could not be held as a matter of law that plaintiff was negligent because he wore a hand flap when injured.

4. APPEAL AND ERROR ⚫═══1001(1)—REVIEW—VERDICT.
　　A verdict will not be disturbed on appeal where there is evidence reasonably sufficient to support it.

5. APPEAL AND ERROR ⚫═══978(3)—DISCRETION—NEW TRIAL—MISCONDUCT OF JURORS.
　　In a personal injury case, the fact that it appears without dispute in the evidence that there was mention made by several jurors of the fact that plaintiff would have to pay his attorneys a portion of any amount recovered is of itself insufficient to warrant reversal, unless it clearly appears from the record that the trial court abused its discretion in denying new trial therefor.

6. APPEAL AND ERROR ⚫═══933(4)—PRESUMPTION—DENIAL OF NEW TRIAL.
　　Where trial court made no findings of fact in denying motion for new trial for misconduct of jurors in discussing amount plaintiff would have to pay his attorneys in case he recovered, it will be presumed that the trial judge concluded that the discussion did not influence the verdict, the evidence being sufficient to warrant such conclusion.

7. NEW TRIAL ⚫═══44(1) — MISCONDUCT OF JURY.
　　On its appearing with reasonable certainty on motion for new trial that the jury has been guilty of misconduct affecting the amount of the verdict, new trial should be granted.

8. NEW TRIAL ⚫═══44(3) — MISCONDUCT OF JURY.
　　Trial courts should be liberal in granting new trial where misconduct of jury in discussing necessity of plaintiff's paying, from his verdict, a share thereof to his attorney, is clearly shown to have taken place in the jury room, and should not hold defendant to a too strict showing of injury.

Appeal from District Court, Polk County; L. B. Hightower, Sr., Judge.

Action by Sid Tomme and another against West Lumber Company. From judgment for plaintiffs, defendant appeals. Affirmed.

Feagin, German & Feagin, of Livingston, and Baker, Botts, Parker & Garwood, of Houston, for appellant. Dean, Humphrey & Powell, of Huntsville, and J. L. Manry, of Livingston, for appellees.

HIGHTOWER, C. J. We find in appellant's brief in this case a full and fair statement of the nature and result of this suit, which is admitted by appellees to be correct, and which is as follows:

This suit was filed in the district court of Polk county on April 26, 1917, by J. H. Tomme for himself, and as next friend of his minor son, Sid Tomme, against the appellant, West Lumber Company, seeking to recover damages for injuries sustained by Sid Tomme alleged to have been caused by the defendant's negligence. The case was submitted to a jury on special issues, and upon the findings of the jury, in answer to these issues, judgment was rendered in favor of the plaintiff Sid Tomme for $10,000, and in favor of the plaintiff J. H. Tomme for $585. In proper time the defendant filed its motion for new trial, claiming that various errors were committed against it in the trial, and in addition set up misconduct on the part of the jury. This motion was overruled, and in proper time the appellant filed its supersedeas bond, and has brought the cause here for review.

The appellee Sid Tomme was injured by what is known as a planing machine, and, in order that this court might get a clear idea of this machine and the manner of its operation, appellant has placed in the back of its brief a picture of this machine. By way of explanation, it is shown that the operator of the machine stands at the front end, and shoves lumber along the bed or feed plate of same, until the front end of the lumber passes between the feed rollers, and these rollers keep the lumber moving forward in the same direction, passing between rapidly moving knives, that dress it off to a smooth surface. Said appellee's duty was thus to feed the lumber into this machine. In order to a clearer understanding of the issues in this case, the photograph of the planing machine as found in appellant's brief will be shown in this opinion.

---

⚫═══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

On the left side at the front of this machine is a lever indicated by the letter "H." When the lever is in the position as shown in the picture, the belt transmitting the power to the feed rollers is so tightened as that it will keep the feed rollers revolving. When this lever is advanced forward into nearly an upright position, the effect is to release the tension on the belt and stop the revolving of the feed rollers. This lever is referred to in the testimony of the various witnesses as the feed lever. It appears that Sid Tomme was injured while extending his hand into the machine over the name plate "No. 1 Mississippi," his hand being drawn into cogs beneath the point of the arrow marked "O," and about opposite the point beneath the name plate indicated by the letter "F." The front part of the cog, which is supposed to have injured Tomme, is indicated by the arrow point marked with the letter "G."

The plaintiffs alleged, substantially, that the defendant, West Lumber Company, was a corporation engaged in the sawmill business at Onalaska, Tex., and had been so engaged for a number of years; that on the 17th day of May, 1915, plaintiff Sid Tomme was employed by the West Lumber Company in feeding one of its planing machines, and that among other things it was his duty to keep the feed plate or bed plate free and clear of shavings or other obstructions; that the planing machine was provided with a feed lever, by which the feed gear of the same was controlled; that it was the duty of defendant to provide and furnish a feed lever of the most approved design and pattern, and to keep the same in good condition and repair; and that defendant failed to furnish and keep such feed lever in repair, but negligently furnished an old feed lever, wholly insufficient for the purpose for which it was intended, and negligently failed to keep said feed lever in such condition of repair that when it was thrown off in order to stop said machinery it would not stand, and thereby prevent said machinery from running while the feed plate was being cleaned. Plaintiffs further alleged that it was the duty of the defendant to furnish a safe place for the said Sid Tomme to do his work, but that the defendant failed to furnish such safe place, by leaving uncovered and exposed several metallic cogs referred to, which they allege should have been hooded or covered; that by reason of the negligence and failure of defendant to furnish a proper feed lever that would control the feed gear of said machine, and by reason of the negligence of defendant to furnish a safe place for Sid Tomme to work, he was injured, and that such negligence was the proximate cause of his injury; that by reason of the negligence of defendant as aforesaid Sid Tomme had his hand caught in the running gear of the planing machine, and the same was badly crushed, and he was thereby injured, and caused suffering and mental anguish. Plaintiffs alleged the damages resulting to the said Tomme as being $25,000; and they alleged the damages resulting to the plaintiff J. H. Tomme to be the sum of $950 for loss of time and earnings, and the sum of $250 for medical attention, etc., making the total damages claimed by J. H. Tomme $1,200.

The defendant, West Lumber Company, answered by general denial, and by allegations that it at all times furnished the said Sid Tomme with a suitable feed lever and all modern equipment and appliances for the purpose of doing his work, and alleged that it was not necessary and that it was not required to cover the cogs at the place where said Tomme's hand was caught; that it had used ordinary care and caution in the selection of its planing machine and feed lever, and ordinary care to keep the same in proper repair; that it had also used proper care to furnish Sid Tomme a safe place in which to perform his work. The defendant further alleged that the injury to the said Sid Tomme was due solely to his own negligence and carelessness by reason of his putting his hand into the running gear of the planing machine at a place where he was not required to put it without first stopping the running of the machine; that if said Tomme did undertake to stop the running of the machine, then he negligently started it again, and that he was further guilty of negligence that was the sole cause of his injury by wearing on his hand a hand flap, and by placing his hand in the machinery with the flap thereon, at a place where he was not required to put his hand, and in doing so the flap was caught in the running gear of the machine and was thereby drawn into the cogs and was injured.

Twenty-nine questions were submitted to the jury for their answers and verdict, and of this number twenty-eight questions were answered by the jury in favor of the plaintiffs.

At the time of the accident in question the appellant was not a subscriber under the Employé's Compensation Act, which accounts for the filing of this suit in the district court of Polk county. It is stated in appellant's brief that the decision of this case and the facts developed on the trial center upon three main issues, and we think that this statement is correct; and these issues are as follows: First. Was the appellant, West Lumber Company, guilty of negligence in any of the particulars alleged that was a proximate cause of Sid Tomme's injury? Second. Was the appellee Sid Tomme guilty of contributory negligence that diminished the liability on the part of appellant in the way of damages for such injury? Third. Was the injury to Sid Tomme due to his own willful acts of negligence?

Counsel for both sides in this case have filed able and exhaustive briefs, and thereby greatly assisted this court in reaching a con-

clusion in the matter, and especially so by their full and complete statements in their briefs of the evidence contained in this voluminous record. We shall not undertake, however, to follow counsel on each specific assignment of error, there being 31 such assignments in appellant's brief, but have concluded to dispose of the case by mentioning and discussing such of them as must control in the decision of this case. We shall first dispose of appellant's second assignment of error, which is as follows:

[1] "Because the verdict of the jury is contrary to and unsupported by the evidence in this: That the uncontradicted evidence shows that the defendant, West Lumber Company, had exercised ordinary care and caution in the selection of the planing machine at which plaintiff Sid Tomme was injured, in that it is shown that said machine was of a standard make, and was in common and ordinary use by planing mills in many parts of the country, and as a planing machine was modern and up to date for the purpose for which it was used, and there being no evidence whatever to show that defendant had failed to use ordinary care in the selection of said planing machine. And because the uncontradicted evidence in the case shows that at the time plaintiff Sid Tomme was injured, said planing machine was in good repair, and because it is undisputed that defendant, West Lumber Company, had used ordinary care and diligence to discover any and all defects (if any) in said machine, and to keep the same in good repair, and to make it suitable and safe for the' work which it was required to do."

Appellant's proposition following this assignment assumes the facts therein stated to be true, and contends, therefore, that there was no liability established against appellant for the injury to the appellee Sid Tomme.

In keeping with the rules for briefing, appellant has, of course, followed this assignment and proposition by a statement of the evidence introduced on the trial, which is quite lengthy, and which appellant contends shows conclusively that appellant was not guilty of any negligence which became a proximate cause of the injury to Sid Tomme in any of the particulars claimed by him; and without discussing this evidence in detail, which is claimed by appellant to support its contention under this assignment, we might say that such evidence was sufficient to show nonliability on the part of appellant for the injury sustained by Sid Tomme, if the same had been believed by the jury in its entirety and given effect; but we cannot admit that the evidence found in the record, as a whole, conclusively showed that appellant was not guilty of negligence in any particular, as claimed by appellees, which became a proximate cause of the injury to Sid Tomme. The jury, of course, was not compelled or bound to believe and accept the evidence favorable to appellant on any issue of negligence charged, in disregard of appellees' evidence on the same point; and while we might dispose of the matter by making a brief summary of the evidence favorable to appellees in this connection, we have decided to set out at some length the testimony favorable to appellees, from which we think the jury was authorized to find liability against appellant in at least some of the particulars claimed by them.

A. S. Carlisle, for appellees, among other things, testified:

"I have worked for this sawmill plant at Onalaska, Texas. I first worked there seven years ago the 27th of this past March, and at that time Wm. Carlisle & Co. owned and operated the sawmill plant. Carlisle & Co. sold the plant to the West Lumber Company. I don't know exactly how long since the West Lumber Company began to operate that plant there, but it has been some length of time; about three years, I suppose."

And further:

"I began working there seven years ago this past March. I have worked there since that time. Carlisle & Co. was still operating the plant then. Now as to what kind of machinery it was then with reference to age, whether it was a new machine or old machine when I fed it seven years ago, well, I would call it an old machine seven years ago. I don't know where Wm. Carlisle & Co. got that machine, but it was an old machine there when I came there. I came from Arkansas, and I worked for Carlisle & Co. in Arkansas. I don't know whether they shipped any of their planing machines from their plant in Arkansas to the plant at Onalaska, but I understand they did. This No. 8 machine (this was the number of the machine in question) was apparently an old machine when I went there seven years ago."

And further:

"When I was working at this machine feeding it seven years ago I said it was an old machine then; I had difficulty at that time about the feed lever falling when I would raise it. The feed lever would fall if I was not mighty particular with it or propped it up or tied it up. I am talking about No. 8 machine, and that is the same machine I was speaking of awhile ago. I will tell you what means I employed to keep that feed lever standing. I tied it up; I had a string when I was feeding the machine. There was a spring on the left-hand side of the frame of the machine to screw up the old crooked lumber, and to make crooked lumber go through the machine straight. There was a wheel there something like eight inches in diameter that had a handle on it, and I tied that string to that little wheel when I raised my feed lever and had a loop in the string. That loop was not tied to the feed lever, but was tied to the little wheel. I would hang it over the feed lever. I put that string there and kept it there most of the time. If I had not done that I say the feed lever would fall down sometimes when I raised it. It fell occasionally."

And further:

"I said it was loose motion. The set screws were worn; practically worn out. I was familiar then and since then with feed levers that are in good condition, and when they are in good condition they will stand. I did not keep up with this feed lever since I was there; that is to say, whether they ever repaired it or not. I just know it would fall back and I know it was an old machine at that time."

R. A. Braeme, for appellees, after stating that he worked for both Wm. Carlisle & Co. and for the West Lumber Company, at Onalaska, testified as follows:

"When I first worked there and when I first saw that machine it was an old machine. As to whether I have recently seen that machine— well, I have been down there, but I did not pay

so much attention to it. It is the same machine that was there when I began work there in 1907. I have seen the machine since Sid Tomme was hurt, and I know it is the same machine that was there in 1907."

And further:

"When I fed it the last time it was not in good condition at that time. I mean that the feed lever was broke and had been repaired. When I would raise the feed lever and stop the running geer or feed gear it would not stand. If it had been in proper order it would have stood when I raised it to stop it. When I had to clean the feed bed I held or tied the feed lever while doing that. The trouble with the feed lever was that it was broke and the wide part of it was loose down there where it connected, where the idler on the feed belts reached in there. At that time there was loose motion there. You could work it and it would cut the threads out of the casting it was made out of. You would work it so much you would cut the threads."

E. A. Tanner, for appellees, after stating that he lived near Onalaska, and that he had worked for the plant there for several years, beginning with Carlisle & Co., and continuing after West Lumber Company acquired it, and also after stating that he was working for the West Lumber Company in the planing mill at the time said Tomme was injured, further testified as follows:

"You asked me what was the condition of the feed lever then, and I say it had become work—it had not been tightened up, lost motion in the feed lever. The feed lever worked in a clutch, and this clutch had become worn, and the screws had become worn and could not be tightened up or had not been. As to my saying they could not, well, it could have been, if they had had the material to fix it with. The kind of material that would have been needed at the time it would have taken some longer set screws than they were using. The effect of that being loose was it would cause it to jar and fall. I have seen it fall, and it fell while I was feeding it. I would raise that feed lever for the purpose of stopping the gear of the machinery, and if it was in good condition when I raised it, it would stop the feed gear. If it was in good condition it would stand after it was stopped until it was pulled down again. When I fed that machine last, about a month before Sid Tomme was hurt, it would not always stand when it was raised. I fed it extra and I used a string to hold the lever up. The company furnished the string. The string was made of laced leather. I did not ask them for it, but it was laying on the end of the bench and I picked it up. I used it myself to keep from getting hurt. It caught my arm one time very slight. That string had been taken out of a belt, that had been used for lacing belts. The reason why I got that string to tie it up was to keep from getting hurt. I have been hurt in that machine. There is the scar on my arm (indicating) that happened when those cogs caught it and pinched it. I had raised the feed lever to stop it, and it stopped the machinery when I raised it, and when I put my arm through to take the litter off the face of the lumber to keep from injuring the manufacture of the lumber for a bill of some kind the feed lever fell. The jar of the mill caused it to fall. I jerked my arm back and it just pinched me. I happened to see it just as soon as it fell, and I jerked my arm back immediately and still got pinched. I told the helper, C. Stokes, about it. The helper's occupation there was to keep up the machinery and see about the lumber being manufactured. It was his duty to see that these machines were in proper condition."

And further:

"I tied a string to the feed lever handle and put a nail in the end like that (indicating), and when I would raise the feed lever I would fasten it in the framework of the machine to keep the feed lever from falling. After I got hurt I did that way. I did not pay any attention to the condition of this feed lever the day Sid Tomme was hurt. I saw it just a short while afterwards. It was in the same condition it was in when I fed it. The last time I saw the machine it had not been repaired. Up to the time he was hurt, when I saw it a few days afterwards, it had not been repaired. I told Mr. Stokes how it fell and showed him how it hurt me."

And further:

"If they had had longer set screws than they had so they could tighten them up it would have tightened the lever so that the weight on the feed lever would not have motion in it to overbalance the feed lever and cause it to drop back. I say it was loose, and that caused the loose motion, and that caused it to overbalance it and drop back. Just a jar either way it tilted it would be likely to fall that way. The power of the mill was there to jar it. The whole thing was in a quiver."

John West, for the appellees, after testifying that he was working for the West Lumber Company at the time Sid Tomme was injured, and that he was feeding machine No. 5 in the planing mill, and also that he had fed this particular machine which injured Tomme, before the injury, further testified:

"I know there was a defect or trouble in the feed lever of that machine; it was worn bad. When I first went to feeding it I first noticed that it was worn bad. The holes in it where the set screws were worn, and the effect of that was that when you would raise the feed lever to stop the machine, being loose that way, it would cause it to drop around, and if it got too far it would drop back. That was because it was loose and would not stand. The jar of the machinery caused it to move around. The planer machine and the planing mill were running, which would cause the jarring of everything. The power came from the engine room, which was separate from the mill. It was a long time, five or six months, before Sid was hurt, when I first noticed that this feed lever was loose and that lost motion. I know it was still that way when he got hurt. I noticed it the next day after he was hurt. We were looking at it then, and it was still in that condition the next day. If that had been tightened up, the effect would have been that when the feed lever was raised to stop the machine it would have held itself up. Those planing machines that were tightened up there, in the planing mill, none of the feed levers on them that I know of would fall when they were raised. The purpose for which you would raise that feed lever would be to stop the running gear of the machine."

And further:

"I had known for five or six months that that feed lever was not in such a condition that it would stand. I discussed that with Mr. Stokes. I told him. I asked him why he did not fix it tight. He did not have screws sufficient to fix it with. Mr. Stokes' name is C. Stokes, and his business there was a helper. The helper would keep the machinery in repair, in running shape. I told him about this feed lever, and he said he did not have the proper screws to fix it with. That was before Sid Tomme was hurt. It was worn so bad it would take larger screws where they would have to tap out the holes in the machine."

The witness Howard Bailey testified by deposition, substantially, that he was working for appellant at the Onalaska plant on the day that Tomme was hurt; that at the time of the injury he (witness) was standing by his edger, not working, about 15 or 20 feet from where Sid Tomme was; that he saw Tomme raise the feed lever and walk around by the machine, and paid no more attention until he heard Tomme holler; that he then looked that way and saw that Tomme was caught in the machine; that witness then went to Tomme, and threw off the feed lever, and when he attempted to help Tomme get his arm out the lever did not stand, but closed and caught his arm again; that when the feed lever thus closed one Eugene Goyens held the lever until they shut the whole planing mill down, and then they got Tomme out. And further:

"After Tomme was hurt I first threw off the feed lever myself and it failed to stand. Eugene Goyens then threw it off and held it until the machinery stopped running. It is not a fact that the feed lever of this machine was in good working order and continued to be operated in the same condition as long as I remained at Onalaska. It was not in good working order at the time of the accident. I have seen them working on this machine after the accident, but I don't know whether they fixed the feed lever or not."

The witness Goyens also testified by deposition, stating that he was in the employ of the West Lumber Company, working in the planing mill, at the time Tomme was injured; that when he first saw Tomme after the injury the machinery was running and the feed lever was thrown on; that Howard Bailey threw off the feed lever in order to stop the machinery, but the feed lever did not stand; that it fell and started the machinery going again, and that witness raised the feed lever a second time. And further:

"I have had about ten years' experience operating a planer." Then to this question: "Were a machine provided with lever, as in the instance where Mr. Tomme was injured, that in throwing the lever to release does not the lever pass beyond the center, and unless it is moved back from the center again it is impossible for it to fall of its own accord?" he answered: "I say it was supposed to pass beyond the center, but the bolt was loose and it would not stay, but it would fall back of its own accord. The lever of that machine would not stand, and it was absolutely the fault of the lever that caused Mr. Tomme to get caught in the machinery."

The appellee Sid Tomme testified, among other things, substantially that he was about 18 years of age at the time of the injury, and was at the time feeding this planing machine No. 8; that as feeder of the machine it was his duty, when chips or splinters collected on the feed bed, to clean them off; that on this particular occasion at the time of the accident he was cleaning off the bedplate of the machine before the grader (the man who grades the lumber) had motioned to him to run the board out of the machine; that the grader had a certain sign that he gave Tomme; that the grader gave this sign, and Tomme ran the board through the machine to clean off the feedplate; that he knew what was to be done and went to clean off the bedplate. And further:

"Before I began to clean it I raised the feed lever for the purpose of stopping the feed gear of the machine. It did stop it. Then I started to clean off the bedplate of the machine, and did clean it off. The instrument I used to clean it off was a stick about that long (indicating)—that stick I used was the usual instrument used for that purpose. There was nothing unusual in the way I cleaned off the bedplate, as I cleaned it in the usual way."

He further testified, substantially, that just as he got the feed bed cleaned off the feed lever caught his hand or the hand flap that he had on at the time; that he was using his right hand at the time, being right-handed; that when the feed lever fell and the feed gear started going it caught his hand and pulled it down through the cogs and ground it off right at the wrist, and knocked a big hole in his arm, taking out parts of the bone.

One of appellant's witnesses, R. A. Groves, also testified, on cross-examination, substantially that after the feed lever is raised, if it is in proper condition and repair, it has the effect to stop the feed gear; that if it stops the feed gear it is in proper condition, but that if when properly raised it does not stand and stop the feed gear, it is not in good condition.

And appellant's witness Jay Alford, also on cross-examination testified, among other things, as follows:

"This lever when you go to release the running gear, I raise the lever and that stops the running gear. It slacks the belt and stops the gear, and when there is a splinter or something on the bedplate, and I want to get it out, the proper thing to do would be to raise the feed lever before you commence getting it out. Yes, sir; that would be the proper thing to do."

And further:

"If the feed lever is in proper shape and repair, if you raise that feed lever up sufficient to stop that running gear, if it is properly repaired and in proper shape it will stand; it will not fall of its own accord."

And further:

"If you raise that feed lever, and it stands long enough to stop this machinery, the running gear, then if it does fall on its own accord, then it is not in proper condition of repair and could not be; if you raise it up there, and it stays there, and then falls back, it could not be in proper condition of repair."

And appellant's witness C. Stokes testified, substantially, that he had been planing mill foreman for appellant at Onalaska for nearly six years, and had worked at the mill there for about twelve years. On cross-examination he testified, in answer to the question whether he ever fixed any part of this particular machine, or had known it to be fixed, in the six years he had been there—that is, any of the screws or bolts pertaining to same—as follows:

"Well, they might have been tightened up; there were no new ones put in so far as I know.

I do not know how that lever got broken at the time it was broken. That part of the feed lever was broken when I went there."

And further to this question:

"After you patched it up, would it still be loose? Was it still loose after you patched it?"

—he answered:

"I say it would naturally wear and work loose. There was a loose motion and looseness. It could be raised and lowered, and when it was raised they had to tie it in order to keep it standing. In order to be sure it would not fall, as to whether it would fall sometimes if they did not tie it, well that boy complained about it falling, but it never fell with me. As to whether I know from repairs made by me in my position it would fall sometimes if it was not tied back—that one repair; yes, sir. The reason it would fall was because of the looseness of it."

Before concluding on this point, we should state that Sid Tomme himself testified that he had been working at and near this particular machine for a period of about three months immediately prior to his injury, and that during that period of time he had perhaps spent as much as five or six weeks, off and on, operating this particular machine, and that during this period of time had not observed the lever on this particular machine to fail to stand when raised by him, and that he had operated this lever, throwing it on and off, as frequently perhaps as much as twelve or fifteen times daily. This particular testimony on the part of Sid Tomme is claimed by appellant to be conclusive in support of their contention that the lever of the machine in question was in proper repair and condition for at least a period of three months prior to the injury and up to the very time of the injury; and that, therefore, the jury's finding to the effect that this lever was defective and out of repair, and that appellant was guilty of negligence in permitting it to be so, was not supported by the evidence, and that this court should so hold. After examining the entire evidence, as reflected by the record in this case, much of which we have above quoted, we have concluded that the evidence as a whole warranted the jury's finding that this lever was defective and out of repair, as claimed by appellees, and that this condition became and was a proximate cause of the injury to the appellee Sid Tomme. This was clearly found, expressly, by the jury; and while, as we stated in the beginning of this opinion, the evidence on the part of appellant, if believed and accepted in its entirety by the jury, would be sufficient to show that the lever in question was in proper repair at the time of the injury yet we also must conclude following the well-established rule in this state, that the evidence as a whole was sufficient to warrant the finding of the jury, convicting appellant of negligence on this point, and also to warrant the finding of the jury that this negligence proximately caused Sid Tomme's injury.

If we are correct in our conclusion thus far reached, it becomes unnecessary to decide whether the finding of the jury to the effect that appellant was guilty of negligence in not having the metallic cogs of this machine hooded, as claimed by appellees, or whether appellant was guilty of negligence in any other respect, as claimed by appellees; because if appellant was guilty of negligence in furnishing a defective machine as respects the lever mentioned or in not keeping the same in proper repair, as claimed by appellees and as found by the jury, and if that negligence became and was a proximate cause of Sid Tomme's injury, then that of itself would be sufficient to warrant the judgment in this case, and to compel its affirmance, unless appellant's contention that Sid Tomme was guilty of contributory negligence should be sustained, or unless its contention that the judgment should be reversed on account of misconduct of the jury trying the case should be sustained.

[2-4] We therefore next consider appellant's nineteenth and twenty-third assignments of error, which are as follows:

Nineteenth assignment: "Because the verdict of the jury is contrary to and unsupported by the evidence, in this: That the undisputed evidence shows that the plaintiff Sid Tomme was guilty of contributory negligence that alone brought about his injury, and that greatly reduced and diminished his damages (if any); and that by reason thereof plaintiff was not entitled to recover any sum whatever, in this: (1) Because it is undisputed that the plaintiff Sid Tomme failed to stop the entire planing machine at which he was working before undertaking to remove the splinter or obstruction from the bedplate thereof, and that his failing to do so was contributory negligence. (2) Because the great preponderance of the evidence shows that the plaintiff Sid Tomme failed to throw the feed lever of said planing machine before undertaking to remove the splinter or obstruction from the bedplate thereof, or that if he did throw the same, that he did not throw it in a safe and proper manner, thereby causing the same to immediately fall again, and that his failure to so throw said feed lever was contributory negligence on his part. (3) Because the great preponderance of the evidence shows that if the said Sid Tomme did throw said feed lever of said planing machine before undertaking to remove the obstruction from the bedplate, that by his own acts of negligence and carelessness he again started the feed gear of said machine, and thereby caused his own injury, and that his act in so doing was contributory negligence. (4) Because the undisputed evidence shows that at the time the plaintiff Sid Tomme was injured he was wearing upon his hand that was injured a long flap, 7 inches wide by 10 inches in length, made of coarse, stiff material, which flap, when worn upon the hand, would hang down from the hand some 8 or 10 inches, and it being undisputed that the wearing of such flap around the planing machine when any part of same was in motion was negligence, and was likely to result in injury to the party wearing same. (5) Because the undisputed evidence shows that at the time the plaintiff Sid Tomme was injured he was wearing upon his hand a long, wide flap, made of coarse, stiff material, and that with such flap upon his hand he placed his hand into a part of the planing machine where he was not required to place same, and placed himself in a dangerous position with reference to said planing machine, and that by reason of placing his hand in such place, and because said flap was upon his hand, the same

became entangled in the cogs of said machine, and his hand thereby was drawn into said machine and injured; that by reason of the construction of said machine, and the location of the cogs and pinions within the interior thereof, it was practically impossible for the said Sid Tomme to have had his hand caught therein and injured, except for said flap being on his hand; and the evidence being undisputed that said flap was the first thing to be caught in said running gear, and but that for said flap being on his hand the said Sid Tomme could not and would not have been injured. (6) Because the great preponderance of the evidence shows that the negligent and careless acts of the plaintiff Sid Tomme in wearing said flap on his hand, and in placing his hand into said machine at the time and place he did, and his failure to stop said planing machine, and his careless and negligent acts in failing to throw the feed gear of said machine, or, if he did throw the same, his negligent acts in starting the same again, were the sole cause of his injury, and but for the same he would not have been injured; that, therefore, the said Sid Tomme being injured solely because of his own negligence, the damages he sustained, if any, were due solely to his own negligence, and should have been reduced accordingly."

Twenty-third assignment: "Because the finding of the jury to special issue No. 5, submitted at the request of the defendant, is contrary to and unsupported by the testimony, in this: Because the uncontradicted testimony shows that if said feed lever had been thrown in a careful and proper manner, then the same could not fall again, unless acted upon by some outside force, and the evidence further showing that the plaintiff Sid Tomme placed himself in such position that it becomes certain that his acts alone were what started said feed gear again, if the same was started."

Issue No. 5, mentioned in this assignment, was as follows:

"If you have answered that plaintiff Sid Tomme threw the feed lever of said machine before undertaking to remove the splinter or obstruction from the bedplate, then did the said Sid Tomme do anything by which the feed gear of said machine was started again?"

—to which the jury answered, "No."

Because of the length to which we have already carried this opinion, we must decline to set out or undertake to discuss in detail the evidence found in this record relative to appellant's contentions as made by these assignments. The jury found, expressly, in answer to proper question submitted by the court, that appellee Sid Tomme was not guilty of negligence or contributory negligence in any respect as pleaded by appellant and as claimed in these assignments, and, after a very careful study and consideration of the evidence bearing upon these contentions, we have concluded that the same raised issues of fact which were peculiarly for the consideration and determination of the jury, and that such evidence was sufficient to warrant and sustain the finding of the jury acquitting appellee Sid Tomme of negligence or contributory negligence, as contended for by appellant. There is in the record testimony of several witnesses which, if believed by the jury, was sufficient to show that it was usual and customary for operators of the machines such as that which injured Sid Tomme to wear what is called hand flaps. It is true some of them say that it was dangerous, for the reason that a hand flap might become caught or entangled in the machine, and thereby cause injury to the operator; but others claimed there was no danger whatever when the machine was in proper condition and properly operated, and, upon the whole facts on this point, the jury determined that Sid Tomme was not guilty of contributory negligence because he was wearing this hand flap on his hand at the time of his injury. It is not claimed that there was any rule or regulation by appellant which prohibited the wearing of these hand flaps, and it cannot be held as a matter of law that Tomme was guilty of negligence simply because he was wearing one of these hand flaps at the time in question. It was also shown, especially by Sid Tomme himself, that he was proceeding, in the usual and customary and proper manner, to clean the machine in question at the time of his injury, and that he properly threw or placed the lever on this machine and brought it to a standstill before attempting to proceed with the cleaning of the machine, but that notwithstanding the lever fell while he was in the act of cleaning the machine, and that thereby the machinery was again started and he was caught and injured. The matters here complained of were clearly issues of fact made by the evidence, and it is not the province of this court to disturb the verdict of the jury where, as we here hold, there is evidence in the record reasonably sufficient to support the jury's finding.

It follows from what we have said that the judgment of the trial court in this case must be affirmed, unless it should be reversed on appellant's first assignment of error. That assignment complains of the action of the trial court in refusing to grant a new trial on the ground that the jury trying this case was guilty of misconduct. This misconduct was alleged in the motion to be that, after the jury retired to consider of its verdict, they discussed and considered the amount of the fee that appellees would have to pay their attorneys for their services in this case, and it was alleged in the motion, in substance, that it was said by several of the jurors, while in retirement and before their verdict was reached, that appellees would perhaps have to pay their attorneys a considerable portion of whatever amount they might recover, some of them stating perhaps as much as one-half would have to be paid to the attorneys, and it was claimed in the motion that the jury, on account of this discussion, were influenced, or at least some of them were influenced, to render a verdict in favor of appellees for a larger amount than they would otherwise have rendered had not such improper discussion taken place in the jury room.

[5, 6] It appears from the record that this ground of the motion was thoroughly con-

sidered by the trial court, and all the members of the jury seem to have testified on this point. It does appear, without dispute in the evidence, that there was mention made by perhaps several members of the jury of the fact that appellees would perhaps have to pay to their attorneys a portion of whatever amount they might recover in this case; but that of itself would not be sufficient to warrant this court in reversing the judgment, unless this court can say from the record that the trial court abused its discretion in denying a new trial on this ground; and, in determining whether the trial court abused its discretion, it becomes necessary for this court to determine whether it clearly appears from the record that the discussion of the question of attorneys' fees by the jury had the effect to influence the jury or any member thereof in finding in favor of appellees for a greater sum than would otherwise have been found had not such discussion taken place. Upon this point we have reached the conclusion that the evidence of these jurors, as heard on the motion for new trial, clearly made an issue of fact, and left it for the determination of the trial court as to whether or not the discussion of attorney's fees caused the jury or any member of it to render a larger verdict against appellant than would have otherwise been rendered. The briefs of counsel for both sides touching this matter contain copious statements of the evidence, and, in our opinion, this evidence was sufficient to warrant the trial court in finding that the discussion of attorney's fees did not have the effect or cause any juror to render a larger verdict against appellant than would have been rendered had not such discussion taken place. The trial court filed no findings of fact upon the motion, but we must presume that the trial judge concluded that no member of the jury was influenced on account of this discussion to render a larger verdict than he would otherwise have done; and the evidence being sufficient to warrant such conclusion on the part of the trial court, and making it clearly a question of fact for its determination, this court would not be authorized to disturb the finding of the trial court on that point.

We notice that appellant cites, in support of its contention that the judgment should be reversed on account of this misconduct of the jury, the case of Ry. Co. v. Roberts, 196 S. W. 1004, which was decided by this court, and in which the writer prepared the opinion. In that case the evidence was absolutely without dispute, to the effect that at least one of the jurors was influenced to render a larger verdict against the appellant, on account of the improper discussion of the question of attorney's fees, than he would have rendered had not such discussion taken place. In that case this court expressed its views of the law, and held, substantially, that when-

ever it appears with reasonable certainty that a jury or any member of it was influenced by any improper conduct in the jury room to render a larger verdict against a defendant than would have been rendered had not such improper conduct occurred, then it would be the duty of the trial court to set aside the jury's verdict and grant a new trial, and that, if the court in such case should refuse to do so, it would be an abuse of the court's discretion, and it would become the duty of this court to reverse the judgment and remand the cause.

This court, also, had occasion very recently to pass upon the same question, in the case of Louisiana & Western Ry. Co. v. Frank White, 202 S. W. 794 (not yet officially reported), in which this court was compelled to reverse the judgment of the trial court because it refused to grant a new trial. But in that case also the testimony was absolutely without dispute, and, indeed, the trial court found as a fact, that one of the jurors was influenced by reason of the improper conduct in the jury room to render a verdict for $5,000 more than he would have rendered but for such conduct, and notwithstanding this fact the trial judge declined to grant a new trial.

[7] We to no extent recede from the views expressed in those cases, but again announce the rule, as we understand it, that wherever it is made to appear with reasonable certainty on motion for new trial that a jury has been guilty of misconduct, and that such misconduct had the effect to cause the jury, or any one of them, to render a larger verdict against a defendant than would have been rendered but for such misconduct, it would be the plain duty of the trial court to set such verdict aside and grant a new trial, and that, if the trial court should fail to do this, it would become the plain duty of the appellate court to reverse the trial court's judgment and remand the cause.

[8] The frequency with which questions of this kind come before the appellate courts of this state is rather remarkable, and, indeed, it is regrettable that such conduct on the part of the juries so frequently occurs; but it must be remembered that the trial court's judgment in cases of this kind can only be reversed where it is manifest to the appellate court that the trial court abused its discretion in failing to grant a new trial. We now take occasion to suggest that it would be well for the trial courts to adopt a liberal policy in granting new trials where misconduct of this character is clearly shown to have taken place in the jury room, and not hold the defendant in such cases to a too strict showing of injury, because it is sometimes a hard matter to get jurors or any of them to absolutely admit that they were influenced to do a thing contrarily inconsistent with their duties, and contrary to the law as given them in charge by the court; and we

believe that it would be a sound and just policy on the part of trial judges to grant new trials to defendants in cases of this character, where conduct of this character has been shown clearly to have taken place, without requiring such defendants to show conclusively that they were injured thereby. From what we have said in this connection, we would not be understood as intimating that the trial court in this case was not clearly justified in overruling appellant's motion on the ground of the jury's misconduct in this case, because this court also is of the opinion, from the evidence in the record, that the misconduct of the jury in this case did not have the effect to cause any member of the jury to render a larger verdict than he would otherwise have done, but we merely make these remarks in the way of a suggestion to the trial courts, because frequently and usually those courts are in a better position to protect the interests of litigants in matters of this kind than the appellate courts of this state.

Believing that our conclusions regarding appellant's second, nineteenth, and twenty-third assignments of error have the effect to dispose of this appeal, and that other assignments become immaterial and could not have the effect to reverse the judgment in this case, and also believing that the first assignment, complaining of the misconduct of the jury, cannot be sustained, all assignments of error are overruled, and the judgment of the trial court will be affirmed, and it is so ordered.

---

⬯For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes